UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS LEE ERVIN, | CASE NO. CV 00-1228 LHK |
| Petitioner, | **DEATH PENALTY CASE** |
| v. | |
| RON DAVIS, Warden,<br>California State Prison at San Quentin, | ORDER |
| Respondent.[1] | |

## I. INTRODUCTION

Respondent filed a motion for summary judgment with respect to all 37 claims contained in Petitioner's amended petition for a writ of habeas corpus. Petitioner opposes Respondent's motion and requests an evidentiary hearing on 15 claims. This Order addresses Petitioner's claims 1 through 6, which pertain to severance and jury selection issues. For the reasons discussed below, Respondent's motion with respect to claims 1 through 5 is GRANTED, and ruling on claim 6 is deferred. The remainder of Petitioner's claims shall be addressed in subsequent Orders.

---

[1]Ron Davis, acting warden of the California State Prison at San Quentin, is substituted as Respondent for his predecessor in that position pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

United States District Court
Northern District of California

## II. BACKGROUND

The following recitation of the factual background of this case is based on the California Supreme Court's opinion on Petitioner's direct appeal.  *People v. Ervin*, 22 Cal. 4th 48 (2000). The state court's factual determinations are presumed to be correct pursuant to 28 U.S.C  § 2254(e)(1).

Petitioner was convicted in the Superior Court of Alameda County of first degree murder with the special circumstance finding of murder for financial gain for the November 7, 1986 killing of Carlene McDonald.  Evidence at Petitioner's trial established that Robert McDonald, the victim's former husband, hired Petitioner and Arestes Robinson, to kill Carlene for $2,500.00. Petitioner's acquaintance, Armond Jack, drove Petitioner and Robinson to the victim's apartment in El Sobrante on the night of the murder.  Petitioner and Robinson then abducted Carlene.  Using Carlene's vehicle, Petitioner and Robinson took Carlene to Tilden Park and stabbed Carlene to death and left her body.  The men were armed with a BB gun that looked like a .45 caliber pistol as well as the knife used to kill Carlene.  A patrol officer found Carlene's body the next afternoon.

Petitioner and Robinson met with Robert McDonald the day after the murder.  They presented Carlene's driver's license as proof of the killing.  McDonald paid them $2,500.00, which Petitioner shared with Robinson and others to buy cocaine.  McDonald paid Petitioner an additional $1,700.00 a couple of weeks after the murder.  Sharon Williams, Petitioner's girlfriend, testified that Petitioner gave her a watch and a ring later identified as belonging to Carlene.  Jack testified under a grant of immunity that he had driven with Petitioner to meet with McDonald to negotiate the price for killing Carlene.  Jack was also present when Petitioner and Robinson searched for Carlene's car in a Bay Area Rapid Transit (BART) parking lot.  According to Jack, while he, Petitioner and Robinson were driving to Carlene's apartment on the night of the murder, Petitioner asked for and received a knife from Robinson.  The knife looked like the 13-inch kitchen knife the prosecutor showed Jack.

Ample physical evidence linked Petitioner to the crime, including his possession of Carlene's watch, ring, car and a BB gun found in the house of Petitioner's acquaintance, David Willis.  The BB gun resembled the weapon Petitioner used to kidnap Carlene.

United States District Court
Northern District of California

1   Additionally, Petitioner admitted various incriminating aspects of the crime to David

2   Willis, Zane Sinnott, Gwyn Willis, and the investigating officer, Sergeant Dana Weaver.

3   According to these witnesses, Petitioner admitted that he and Robinson confronted Carlene,

4   pointed the BB gun at her, forced her into her car and drove her to Tilden Park, where Petitioner

5   stabbed her to death while Robinson held her.  The prosecutor also introduced the prior testimony

6   of Robinson's girlfriend, Gail Johnson, who stated that Robinson admitted participating in the

7   murder.

8   Robinson, McDonald and Petitioner were tried together.  Petitioner made no claims of

9   innocence, but sought to impeach or discredit the testimony of prosecution witnesses Jack, Sinnott

10  and David Willis.  Additionally, Dr. Fred Rosenthal, a psychiatrist, testified that cocaine

11  consumption may have impaired Petitioner's thought processes.

12  During the penalty phase, the prosecution introduced evidence of Petitioner's prior bank

13  robbery conviction and some minor jail disciplinary problems.  The prosecutor also introduced

14  evidence of uncharged assaults involving Robinson as perpetrator.  Petitioner introduced

15  mitigating evidence regarding his character, employment, family, drug use, religious involvement

16  and musical skills.  Codefendants McDonald and Robinson also introduced mitigating evidence.

17  The jury returned death verdicts for Petitioner and McDonald, but chose life imprisonment

18  without parole for Robinson.

19  **III.  PROCEDURAL HISTORY**

20  On January 6, 2000, the California Supreme Court affirmed Petitioner's conviction and

21  sentence.  *Ervin*, 22 Cal. 4th at 66.  The United States Supreme Court denied his application for a

22  writ of certiorari on October 2, 2000.  *Ervin v. California*, 531 U.S. 842 (2000).

23  On November 12, 2002, Petitioner filed a petition for a writ of habeas corpus with this

24  Court.  (ECF Doc. No. 32)  On January 22, 2003, Petitioner filed a substitute corrected petition for

25  a writ of habeas corpus.  (ECF Doc. No. 45)  That same day, the Court stayed the federal habeas

26  proceedings so that Petitioner could return to state court to exhaust claims.  Petitioner filed a state

27  habeas petition on October 1, 2003, and on December 14, 2005, the California Supreme Court

28  denied that petition.

United States District Court
Northern District of California

United States District Court
Northern District of California

1      Respondent filed an answer on November 2, 2006.  (ECF Doc. No. 70)  On September 7,

2  2007, Petitioner filed an amended petition for a writ of habeas corpus raising thirty-seven claims.

3  (ECF Doc. No. 97)  On March 7, 2008, Respondent filed a response to the amended petition.

4  (ECF Doc. No. 110)  Petitioner filed a traverse on November 13, 2008.  (ECF Doc. No. 133)

5      On May 29, 2009, petitioner filed a motion for discovery.  (ECF Doc. No. 143)  This

6  motion was granted in part and denied in part on March 22, 2010.  (ECF Doc. No.  161)  Petitioner

7  filed a request to depose a dying witness, as well as a supplemental motion for discovery on June

8  6, 2011. (ECF Doc. Nos. 178,179).  On September 8, 2011, Petitioner's request to conduct a

9  deposition was granted, and his supplemental discovery motion was granted in part and denied in

10  part.  (ECF Doc. No. 189)

11      Respondent filed a motion for summary judgment on February 14, 2012.  (ECF Doc. No.

12  213)  Petitioner filed a motion to re-open discovery on March 5, 2012.  (ECF Doc. No. 217)  This

13  motion was granted on April 11, 2012.  (ECF Doc. No. 220)

14      On January 8, 2013, Petitioner filed an opposition to respondent's motion for summary

15  judgment and a request for an evidentiary hearing.  (ECF Doc. No. 249)  Respondent filed a reply

16  on May 10, 2013.  (ECF Doc. No. 259).  Petitioner filed a reply to Respondent's opposition to

17  Petitioner's request for an evidentiary hearing on August 16, 2013.  (ECF Doc. No. 266)  The case

18  was transferred to the undersigned Judge on January 7, 2015.  (ECF Doc. No. 268)

19      On March 16, 2015, the Court stayed Petitioner's penalty-phase claims pending the Ninth

20  Circuit's resolution of an appeal filed in *Jones v. Chappell*, 31 F. Supp.3d 1050 (C.D. Cal. July 16,

21  2014).  (ECF Doc. No. 269)  The Ninth Circuit decided *Jones* on November 12, 2015, reversing

22  the district court's grant of relief on a claim that California's post-conviction system of review

23  violates the Eighth Amendment's prohibition against cruel and unusual punishment.  *Jones v.*

24  *Davis*, 806 F.3d 538 (9th Cir. 2015).  All of Petitioner's claims are now ripe for review.

25  **IV.  STANDARD OF REVIEW**

26      **A.   THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT ("AEDPA")**

27      Because Petitioner filed his original petition in 2002, well after AEDPA's effective date of

28  April 24, 1996, the standards of AEDPA apply to this case.  *See Woodford v. Garceau*, 538 U.S.

202, 206 (2003).  Pursuant to AEDPA, a district court may not grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  In determining whether a petitioner is entitled to relief under this provision, a federal court's review "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).

The "contrary to" and "unreasonable application" prongs of section 2254(d)(1) have separate and distinct meanings.  *See Williams v. Taylor*, 529 U.S. 362, 404 (2000).  A state court's decision is "contrary to" clearly established U.S. Supreme Court law if that decision fails to apply the correct controlling authority or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result.  *Id*. at 412–13.  A decision is an "unreasonable application" of U.S. Supreme Court law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  Importantly, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams*, 529 U.S. at 410).  A state court's determination that a claim lacks merit is not unreasonable "so long as 'fairminded jurists could disagree' on [its] correctness."  *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 653, 664 (2004)).

Holdings of the U.S. Supreme Court at the time of the state court decision are the only definitive source of clearly established federal law under section 2254(d)(1).  *See Williams*, 529 U.S. at 412; *see also Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (per curiam) ("AEDPA permits habeas relief only if a state court's decision is 'contrary to, or involved an unreasonable application of, clearly established Federal law' as determined by this Court, not by the courts of appeals."). While a federal court may "look to circuit precedent to ascertain whether [the circuit] has already held that the particular point in issue is clearly established by Supreme Court precedent," *Marshall*

United States District Court
Northern District of California

1  | *v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (per curiam), "[c]ircuit precedent cannot refine or

2  | sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the

3  | Supreme] Court has not announced," *Lopez*, 135 S. Ct. at 4 (internal quotation marks omitted).

4  | To find under section 2254(d)(2) that a state court's decision was based on "an

5  | unreasonable determination of the facts," a federal court "must be convinced that an appellate

6  | panel, applying the normal standards of appellate review, could not reasonably conclude that the

7  | finding is supported by the record before the state court." *Hurles v. Ryan*, 752 F.3d 768, 778 (9th

8  | Cir. 2014) (internal quotation marks omitted), *cert. denied*, 135 S. Ct. 710 (2014).  In other words,

9  | "a state-court factual determination is not unreasonable merely because the federal habeas court

10 | would have reached a different conclusion in the first instance." *Burt v. Titlow*, 134 S. Ct. 10, 15

11 | (2013) (internal quotation marks omitted).  That said, "where the state courts plainly

12 | misapprehend or misstate the record in making their findings, and the misapprehension goes to a

13 | material factual issue that is central to petitioner's claim, that misapprehension can fatally

14 | undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor

15 | v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

16 | In the event that a federal court "determine[s], considering only the evidence before the

17 | state court, that the adjudication of a claim on the merits resulted in a decision contrary to or

18 | involving an unreasonable application of clearly established federal law, or that the state court's

19 | decision was based on an unreasonable determination of the facts," the federal court evaluates the

20 | petitioner's constitutional claim "de novo." *Hurles*, 752 F.3d at 778.  If constitutional error is

21 | found, however, habeas relief is warranted only if that error "had substantial and injurious effect

22 | or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

23 | Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they

24 | are not entitled to habeas relief based on trial error unless they can establish that it resulted in

25 | 'actual prejudice.'" *Brecht*, 507 U.S. at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449

26 | (1986)); *accord Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015).

27 | **B. SUMMARY JUDGMENT**

28 | Summary judgment is appropriate if, viewing the evidence and drawing all reasonable

inferences in the light most favorable to the nonmoving party, there are no genuine disputes of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986). At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559–60 (2006). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Bald assertions that genuine issues of material fact exist," however, "are insufficient." *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007); *see also United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) ("To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations."). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## V. DISCUSSION

### A. Claim 1

In claim 1, Petitioner asserts that the trial court deprived him of his constitutional rights by failing to order separate trials when conflicts arose during jury selection and trial. In June 1988, the prosecution moved to consolidate the case against Petitioner, Robinson and McDonald. Over Petitioner's objection, the counts against the three defendants were consolidated. Later, in February 2009, Petitioner moved to sever his case from those of his codefendants. His motion was denied. Petitioner contends that the joinder of the cases was prejudicial. He asserts that jurors qualified to judge Petitioner were eliminated due to their inability to return a death verdict for McDonald—because of his lack of physical involvement in the murder and spotless criminal record—resulting in a death-leaning jury. (ECF Doc. No. 249 at 28) Additionally, Petitioner alleges that the trial judge's repeated instructions that evidence which was admissible against one or two of the defendants was not admissible against another defendant resulted in a strong likelihood of jury confusion. (ECF Doc. No. 249 at 29)

United States District Court
Northern District of California

1   Respondent alleges that the California Supreme Court reasonably denied this claim on

2   direct appeal.  The California Supreme Court found that in contesting the trial court's denial of his

3   motion to sever, Petitioner improperly relied on "supposed conflicts," such as the removal of

4   jurors who indicated that they might be unable to return a death verdict for McDonald, that

5   occurred after the court had denied severance.  *Ervin*, 22 Cal. 4th at 68.  The California Supreme

6   Court noted that "a motion to sever must be supported by adequate grounds existing at the time the

7   motion is heard."  *Id.*  The California Supreme Court also rejected Petitioner's claim that the trial

8   court had a sua sponte duty to sever once grounds for severance developed, as follows:

> [Petitioner's] point lacks merit.  We have held that, in light of the
> statutory preference for joint trials, (*see* § 1098), severance remains
> largely within the trial court's discretion.  Nonetheless, we have also
> stated that a reviewing court may reverse a conviction when,
> because of consolidation, "a gross unfairness" has deprived the
> defendant of a fair trial.  The record in the present case, however,
> fails to show that the jurors in this joint trial were unable or
> unwilling to assess independently the respective culpability of each
> codefendant or were confused by the limiting instructions.  Indeed,
> their verdicts (imposing death for McDonald and defendant, but life
> without parole for Robinson) indicate the contrary was true.
> Defendant points to no "gross unfairness" resulting from the trial
> court's failure to sever.  He merely cites "the possibility of juror
> confusion."  We find no abuse of discretion, denial of due process,
> or other error in the court's ruling denying severance, or in its
> subsequent failure to order severance sua sponte.

18   *Id.* at 69 (internal citations omitted).

19   On habeas, a federal court's review of a state court's denial of a severance motion is not

20   governed by state laws relating to severance.  *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir.

21   1997) ("We do not depend on the state law governing severance in state trials").  Nor is it

22   governed by federal rules addressing severance in federal trials.  *Id.*; *see Collins v. Runnels*, 603

23   F.3d 1127, 1131-32 (9th Cir. 2010) (finding that United States Supreme Court decisions

24   addressing severance under federal rules do not apply to analysis of whether joinder in state courts

25   was constitutional).  Rather, its inquiry is limited to the petitioner's right to a fair trial under the

26   United States Constitution.  *Grisby*, 130 F.3d at 370.  To prevail, a petitioner must demonstrate

27   that the state court's joinder or denial of his severance motion resulted in prejudice great enough to

28   render his trial fundamentally unfair.  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

Here, Petitioner fails to establish that the trial court's joinder rendered his trial fundamentally unfair.  Only one course of criminal conduct was involved, the evidence incriminating Petitioner was straightforward, and the roles of the defendants could easily be compartmentalized, as evidenced by the differing verdicts, i.e. the death penalty for Petitioner and McDonald, and life without parole for Robinson.  As the California Supreme Court noted, no "gross unfairness" resulted from the trial court's failure to sever.  *Ervin*, 22 Cal. 4th at 69.

Petitioner argues, nonetheless, that the jury could have been confused by the fact that some evidence was admissible only against certain defendants.  For example, he refers to Gwyn Willis's statement that Petitioner said he was going to collect money from McDonald on the day after the murder.  (ECF Doc. No. 249 at 29)  Petitioner asserts that this statement was initially admitted only against Petitioner, but later deemed to be admissible against McDonald as well.  Petitioner fails, however, to explain how he could have been prejudiced by these evidentiary rulings.

Petitioner also argues that joinder led to the jury hearing Gail Johnson's preliminary examination testimony that she saw Petitioner, Jack and Robinson at her home the night of the murder, that they left together, and that the next day, Robinson possessed a large sum of money.  (ECF Doc. No. 249 at 29)  She also testified about Robinson's comments about being involved in murder for hire.  Petitioner contends that the jury heard this evidence only because trial had not been severed.  The California Supreme Court, however, concluded that this evidence was admissible against Petitioner.  *Ervin*, 22 Cal. 4th at 84-85.  Gail Johnson's testimony thus would have been admitted even if the cases had been severed.

Petitioner further contends that his right to an impartial jury was violated because prospective jurors who would have been qualified to sit on his jury were eliminated solely because they were deemed unqualified to sit as jurors in his codefendant McDonald's case.  Petitioner does not cite to any authority supporting the proposition that excluding such jurors renders a joint trial fundamentally unfair, and the Court has found none.

Finally, Petitioner argues that the trial court's limiting instructions were futile in the face of the confusion allegedly suffered by the jury, and that the resulting prejudice violated the principles enunciated in *Bruton v. United States*, 391 U.S. 123 (1968).  In *Bruton*, the United States Supreme

Court held that the use of the out-of-court confession (or inculpatory statements) of a codefendant who did not testify at trial violates the nonconfessing defendant's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment, and this violation is not cured by a jury instruction that the confession should be disregarded in determining the nonconfessing defendant's guilt or innocence. 391 U.S. at 134-37.   In claiming alleged confusion caused by the statements of various witnesses who are not co-defendants, however, Petitioner's contentions go beyond the scope of the rule in *Bruton*, which is limited to incriminating statements made by a nontestifying codefendant. *See* 391 U.S. at 135-36; *accord Davidson v. Vasquez*, No. 09-56691, 2011 WL 1748349 (9th Cir. May 9, 2011).  Thus, Petitioner's claim 1 cannot rely on *Bruton*.

Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was contrary to or an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.  Accordingly, the Court grants Respondent's motion for summary judgment as to claim 1.

## B.  Claim 2

In claim 2, Petitioner alleges that the trial court violated his constitutional rights by improperly excusing for cause four prospective jurors, Joseph Pontes, Marilyn Pyle, Kathryn Kane and Jean Graham.  He asserts that their views would not have substantially impaired their ability to be neutral and follow the court's directions in contravention of *Wainwright v. Witt*, 469 U.S. 412 (1985).  Petitioner further alleges that these jurors were improperly asked to prejudge the evidence.  Respondent contends that the California Supreme Court reasonably denied this claim.

On direct appeal, the California Supreme Court addressed this claim as follows:

> Defendant next contends that several prospective jurors were improperly excused because they expressed inability to render a death verdict against codefendant McDonald. In each case, the prosecutor outlined the general charges against the three codefendants, observing that McDonald had no prior criminal record and was charged with hiring his ex-wife's actual killers, defendant and Robinson. In each instance, the trial court found, based on the prospective jurors' demeanor and voir dire responses, that their views would prevent or substantially impair their ability to be neutral and follow the court's instructions. (See *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841].) Because prospective jurors frequently give "halting, equivocal, or even conflicting" voir dire responses in capital cases, we usually

defer to the trial court's evaluation of their states of mind and qualifications to serve. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1094 [31 Cal.Rptr.2d 321, 875 P.2d 36].)

Defendant argues that the prosecutor erred in framing his voir dire examination by outlining or previewing the actual case to be tried, disclosing facts about McDonald's lack of criminal record and nonparticipation in the actual killing, and concealing or "whitewashing" aggravating facts about McDonald later used against him at the penalty phase. Defendant relies, in part, on authorities suggesting that prospective jurors may not be excluded under the "automatic vote" rule of *Witherspoon v. Illinois* (1968) 391 U.S. 510, 522, footnote 21 [88 S.Ct. 1770, 1777, 20 L.Ed.2d 776], merely because they expressed an inability to vote for death under the facts in the case before them. (See *People v. Fields* (1983) 35 Cal.3d 329, 358, fn. 13 [197 Cal.Rptr. 803, 673 P.2d 680].) As we observed in *People v. Clark* (1990) 50 Cal.3d 583 [268 Cal.Rptr. 399, 789 P.2d 127], under Fields, "excusing a juror for cause because he would vote against the death penalty based on evidence to be presented would violate Witherspoon," presumably because that vote would not constitute an automatic vote against death regardless of the facts in the case. (*People v. Clark*, supra, 50 Cal.3d at p. 597, fn. 4; see also *People v. Fudge*, supra, 7 Cal.4th at pp. 1094-1095.)

As previously indicated, Witherspoon's "automatic vote" test has been replaced by a different formulation asking whether the prospective jurors' views on capital punishment would prevent or substantially impair the performance of their duties as jurors. (*Wainwright v. Witt*, supra, 469 U.S. at p. 424 [105 S.Ct. at p. 852].) Exposing prospective jurors to the general facts surrounding the case will not inevitably preclude their disqualification under that formulation. As we stated in *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248], "A prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is therefore subject to challenge for cause, whether or not the circumstance that would be determinative for that juror has been alleged in the charging document. [Citations.]"

Thus, we have recently indicated that the court properly may exclude prospective jurors who have expressed an inability to impose the death penalty in any felony-murder case. (See *People v. Pinholster*, supra, 1 Cal.4th at pp. 916-917.) As we stated in *Pinholster*, "Each juror's reluctance to impose the death penalty was based not on an evaluation of the particular facts of the case, but on an abstract inability to impose the death penalty in a felony-murder case." (*Id.* at p. 916; *see also People v. Barnett* (1998) 17 Cal.4th 1044, 1114 [74 Cal.Rptr.2d 121, 954 P.2d 384] [exclusion proper for prospective jurors unable to consider all sentencing alternatives, including death].) *Pinholster* reached its conclusion even though the trial court had permitted the prosecutor to question the prospective jurors regarding their attitudes toward the specific facts of the case. (*People v. Pinholster*, supra, 1 Cal.4th at p. 918.)

*Pinholster* controls here. The record in this case discloses that each of the prospective jurors in question expressed a similar abstract inability to impose death on the hirer in a murder-for-hire case. Paraphrasing *Pinholster*, supra, 1 Cal.4th at page 917, the people of the State of California have determined that murder for hire is a category of crime for which a defendant may be subject to death, depending on the circumstances. We should defer to the trial court's finding, based on their voir dire responses, that the prospective jurors at issue here were unable to follow the law in this respect. (*See People v. Fudge*, supra, 7 Cal.4th at p. 1094.) Accordingly, the exclusions were proper under *Wainwright* and *Pinholster*. We note that none of the foregoing authorities suggest that, for voir dire purposes, the prosecutor must disclose all facts, aggravating or otherwise, that comprise the People's case.

In any event, it seems doubtful defendant could demonstrate he was prejudiced by the exclusion of prospective jurors who indicated they could not impose the death penalty on a person such as McDonald but expressed no difficulty with a death sentence for actual killers such as defendant or Robinson.

*Ervin*, 22 Cal. 4th at 69-71.

A prospective juror must be removed for cause if his views or beliefs would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *Wainwright*, 469 U.S. at 424. "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." *Tinsley v. Borg*, 895 F.2d 520, 523-34 (9th Cir. 1990) (internal quotation marks omitted).   Federal habeas relief may be granted for a state trial court's failure to strike a juror for cause only when there is no fair support in the record for the trial court's determination that the juror was unbiased. *Wainwright*, 469 U.S. at 434.   The state court's determination of juror partiality is entitled to a presumption of correctness on federal habeas review. *Id.* at 429; *Patton v. Yount*, 467 U.S. 1025, 1038 (1984); *see also United States v. Alexander*, 48 F.3d 1477, 1484 (9th Cir.) (determination of impartiality particularly within province of trial judge), *cert. denied*, 516 U.S. 878 (1995).

Petitioner's contention that the prosecutor improperly asked the jurors to prejudge the evidence is unavailing.   The disclosure of facts relating to McDonald's lack of a criminal record and non-participation in the killing were aimed at determining whether the prospective jurors would invariably decline to vote for death in a murder-for-hire case. *See*, *e.g.*, questioning of Pontes, RT 1821 ("If . . . you have concluded that . . . the defendant McDonald hired people to kill his former wife . . . murder for hire, if you will . . . for that type of crime . . . do you really think

12

that you'd have an open mind . . . as to both sentencing choices?"); questioning of Pyle, RT 2490-91 ("If, in the guilt phase of trial, you. . . decided that Mr. McDonald hired two people to kill his former wife and the other two defendants participated in her murder.  Basically,  . . . a murder for hire.  Do you think you'd have an open mind in beginning the penalty trial as to both sentencing options?"); questioning of Kane, RT 3261 ("The facts . . . are that Mr. McDonald . . . sought to have . . . [his wife] murdered and he hired two others to do that . . . Is that a type of crime that you think is serious enough in which the death penalty could possibly apply?")  The record thus supports the California Supreme Court's determination  that the dismissed jurors' reluctance to impose the death penalty was based not on an evaluation of the specific facts of the case, but on an "abstract inability to impose death on the hirer in a murder-for-hire case." *Ervin*, 22 Cal. 4th at 70-71.

Noting that murder-for hire is a capital crime in California, the California Supreme Court proceeded to defer to the trial court's finding that the jurors in question would be unable to follow the law and concluded that their exclusions were proper under *Wainwright*.  *Id.* at 71.  As discussed below, the California Supreme Court's decision is supported by the record.   Although the California Supreme Court referred to the excused jurors collectively, this Court will address each in turn.

### 1.   Joseph Pontes

The record supports the California Supreme Court's determination that Pontes' dismissal was proper.  The prosecutor asked Pontes:

> If, in the penalty phase, it is shown that Mr. McDonald has never been in trouble in his whole life prior to this particular crime, and you hear mitigating evidence on his behalf, would you ever be able, in that situation, to impose the death penalty based on the crime itself?

RT 1827.  Pontes answered "no."  *Id.*

After the prosecutor finished questioning Pontes, Spencer Strellis, McDonald's attorney, questioned Pontes as follows:

> Q: My client is accused of the crime that we're talking about.  Now all I am asking you: is that the kind of crime, in and of itself, where you could make, intelligently, a decision between life and death or is

that the kind of crime it's either so bad that you would always vote for death or it's just not bad enough that that would bring you within the spectrum where you could conceive of yourself returning a death penalty?"

A: It's not that kind of crime.

Q: When you are talking of the death penalty, you are thinking of children, mutilating, and hundreds of thousands of people killed and stuff like that?

A: Possibly, yes.

Q: In any instance, if I understand what you are telling me, this is not a crime that reaches that threshold for badness, for want of another word?

A: Yeah.

RT 1827-28.  After this response, the trial court made the determination that based on *Wainwright*, Pontes' views would "substantially impair his ability to be neutral and follow the court's instructions."  RT 1828.

In light of Pontes' statement that the crime at issue was not the "kind of crime" that would warrant the death penalty, the record supports the California Supreme Court's determination that Pontes expressed an "abstract inability to impose death on the hirer in a murder-for-hire case" and would therefore be unable to follow California law categorizing murder-for-hire as a death-eligible crime.  *Ervin*, 22 Cal. 4th at 70-71.  The record confirms that Pontes' views would impair his ability to perform his duties in contravention of *Wainwright*, 469 U.S. at 424  (prospective juror may be excluded for cause if the juror's views would prevent or substantially impair the performance of his duties in accordance with his instructions and oath).  Furthermore, Respondent has failed to adduce clear and convincing evidence that the factual determination by the trial court was erroneous.   *Id*. at 427, 435 (question of challenge of prospective juror for bias is factual issue entitled to presumption of correctness).  The California Supreme Court reasonably denied this claim.

### 2.  Marilyn Pyle

The record supports the California Supreme Court's determination that Pyle's dismissal was proper.  The prosecutor questioned her as follows:

Q:  My question to you is this: if it is shown that the hirer, Mr. McDonald, has never been arrested before, had no prior contacts with the law other than this particular case, and the only thing we have is he hired two other people to kill his ex-wife, could you ever see yourself returning a death penalty on this person?  He is the hirer, was nowhere near the murder victim, never been in trouble with the law before and this is his only contact.  Could you ever see yourself returning a verdict of death on such a person?

RT at 2517-18.  Pyle replied that she did not think that she could vote for death given that scenario.  RT 2518.

Shortly after the above conversation, Pyle engaged in the following exchange with the trial court:

The Court: I take it, basically, what you are telling us, Mrs. Pyle, that at least with respect to Mr. McDonald, who is alleged to have been the hirer and not have participated in the actual killing himself, that you have essentially ruled out the death penalty as to him, am I correct?

Prospective Juror Pyle Witness: Yes, I guess so.

The Court: All right.  The matter being submitted, I will indicate, first of all, that there has been some inconsistency in the witness's answers.  I say that, by the way, not as any criticism of you, Mrs. Pyle.  But there has been some inconsistencies in her answers.  However, I've been carefully observing the prospective juror, and based on *Wainwright v. Witt*, having in mind the witness's responses and her demeanor, I'll find that she does have a state of mind which is going to prevent her from acting with complete impartiality and being able to follow the instructions of the court.

RT 2519.  In light of Pyle's confirmation that she had ruled out the death penalty with respect to McDonald, the record supports the California Supreme Court's determination that Pyle's views would impair her ability to perform her duties in contravention of *Wainwright*, 469 U.S. at 424.  Respondent has failed to adduce clear and convincing evidence that the factual determination by the trial court was erroneous.  *Id*. at 427, 435.  Accordingly, the California Supreme Court reasonably denied this claim.

### 3.  Kathryn Kane

A review of the record reveals that the California Supreme Court reasonably determined that Kane's dismissal was proper.  The prosecutor questioned her as follows:

Q.  Given the circumstances that I have indicated, that he hired two others to kill his ex-wife—and you will have found that to be true beyond a reasonable doubt—and we got to the penalty phase, the

15

> evidence shows that he has never ever been arrested before, not even for a traffic ticket, okay, do you think—could you foresee yourself voting to execute a person under those circumstances?

RT 3267.  Kane replied that under those specific circumstances she could not apply the death penalty.  *Id.*

After the prosecutor finished his questioning, the trial court questioned Kane as follows:

> Q.  I take it that you are, then essentially telling us that as to a person who hired others to commit a murder, that you basically would have ruled out the death penalty, am I correct, a person didn't actually participate in the murder?
>
> A.  Yes.
>
> Q.  And that's without regard to whatever other aggravation might be presented.  Basically, if the person did not actually participate in the killing, you could not vote to have that person put to death, that's what your telling me?
>
> A.  Yes. . . .
>
> The Court: I have been carefully observing this particular juror, and I will find, pursuant to *Wainwright vs. Witt*, from her demeanor and her responses that her views are going to prevent or substantially impair the performance of her duties as a juror in accordance with the Court's instructions and her oath.

RT 3268.  In light of Kane's statement that she would rule out the death penalty for a person who hired others to commit a murder irrespective of any aggravating evidence that may be presented, the record supports the California Supreme Court's determination that Kane's views would impair her ability to perform her duties in contravention of *Wainwright*, 469 U.S. at 424.  Here too, Respondent has failed to adduce clear and convincing evidence that the factual determination by the trial court was erroneous.  *Id.* at 427, 435.  Accordingly, the California Supreme Court reasonably denied this claim.

### 4.  Jean Graham

A review of the record reveals that the California Supreme Court reasonably determined that Graham's dismissal was proper.  The prosecutor engaged in the following exchange with Graham:

> Q. . . . Do you suppose you can, with somebody never convicted before . . . and it was a murder for hire, could [you] send someone to the gas chamber?

United States District Court
Northern District of California

> A.  Not really, if he didn't kill it, two friends do it, it was over their minds to do it, if they was stupid enough to do it.  He didn't have to do it.
>
> Q.  He did not kill his ex-wife.  Could you sentence somebody to die when he did not kill anybody?
>
> A.  No, I wouldn't.

RT 1404.  Graham later reiterated her position, pointing out that the hirer (McDonald), "didn't do nothing.  He just rolled out the program."  RT 1407.  In light of these statements, the record supports the California Supreme Court's determination that Graham's views would impair her ability to perform her duties in contravention of *Wainwright*, 469 U.S. at 424.  Respondent again has failed to adduce clear and convincing evidence that the factual determination by the trial court was erroneous.  *Id*. at 427, 435.  The California Supreme Court reasonably denied this claim.

For the above mentioned reasons, the Court grants Respondent's motion for summary judgment as to claim 2.

## C.  Claim 3

Petitioner's third claim alleges that the trial court violated his constitutional rights by refusing to dismiss for cause nine jurors who demonstrated clear bias against the defense that arose either from their pro-death penalty views or prejudice against a nontestifying defendant. Petitioner asserts that he was forced to use his peremptory challenges to excuse six of the nine jurors, which left on the jury three allegedly "pro-death penalty" jurors: Robert Vanwagner, Dovie Cambra and Stanley Wyke.[2]  Petitioner claims that he did not exhaust his remaining peremptory challenges to remove the allegedly biased jurors for fear of potentially drawing even worse jurors. (ECF Doc. No. 249 at 41)  Respondent counters that Petitioner's claim is procedurally defaulted, and also lacks merit because it was reasonably denied by the California Supreme Court.

On direct appeal, the California Supreme Court addressed this claim as follows:

> Defendant next asserts the court erred in failing to excuse for cause nine prospective jurors who either were predisposed to a death verdict, or expressed reservations about applying the presumption of innocence to a nontestifying defendant.  Defendant and his

---

[2]Petitioner also contends that juror Stephen Higgins was "too fatigued" to pay close attention to the trial.  (ECF Doc. No. 249 at 42)

codefendants exercised peremptory challenges to exclude six of these prospective jurors, but defendant failed to exhaust his available challenges to exclude the remaining ones. Under settled law, his failure to exhaust peremptory challenges or to justify his omission bars defendant from claiming that his challenges for cause were improperly denied. (E.g., *People v. Fairbank* (1997) 16 Cal.4th 1223, 1238 [69 Cal.Rptr.2d 784, 947 P.2d 1321]; *People v. Danielson* (1992) 3 Cal.4th 691, 713-714 [13 Cal.Rptr.2d 1, 838 P.2d 729].)

Defendant claims he reserved three peremptory challenges for tactical reasons, fearing the eventual seating of even more objectionable prospective jurors. (See *People v. Danielson*, supra, 3 Cal.4th at pp. 713-714; *People v. Box* (1984) 152 Cal.App.3d 461, 464-466 [199 Cal.Rptr. 532].) But defendant's counsel implicitly accepted the jury as constituted by passing without using his remaining challenges or requesting additional ones. Accordingly, defendant waived his right to complain about the court's failure to excuse any remaining prospective jurors for cause. (See *People v. Danielson*, supra, 3 Cal.4th at p. 714; see also *People v. Fairbank*, supra, 16 Cal.4th at p. 1239 [rejecting similar "after-the-fact justifications" for failing to exhaust peremptory challenges].)

In any event, we have reviewed the record, and it supports the court's rulings as to each of the three prospective jurors left unexcused by peremptory challenges. Although these persons stated either that they distrusted defendants who elected not to take the witness stand to testify, or that they were predisposed to impose death for murders for hire, they eventually affirmed their ability to follow the law and give defendant a fair trial. We should defer to the trial court's finding, based on their voir dire responses, that these three prospective jurors were able to follow the law in this respect. (See *People v. Fudge*, supra, 7 Cal.4th at p. 1094.)

*Ervin*, 22 Cal. 4th at 71-72.

Respondent contends that Petitioner's claim is procedurally defaulted because the state court concluded that defense counsel's failure to exhaust his peremptory challenges resulted in a waiver of the claim. Under the doctrine of procedural default, federal courts will not review "a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). In the interest of efficiency, the Court will assume that Petitioner's claim is not defaulted and will address the merits of his claim. *See Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("procedural bar issues are not infrequently more complex than the merits issues . . . so it may well make sense in some instances to proceed to the merits"); *Carranza v. Long*, No. CV 13-5555-R (JPR), 2014 WL 580240 at *10

(C.D. Cal. Feb. 12, 2014) ("[b]ecause it is easier to dispose of this [defaulted] claim on the merits . . . the Court resolves it solely on that basis. ")

The right of peremptory challenge is not guaranteed by the United States Constitution.  *See United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000).  Rather, it is an important statutory right that courts have considered vital to the Sixth Amendment guarantee of an impartial jury trial.  *Id.*  It is clear, however, that as long as the jury that sits is impartial, the loss of a peremptory challenge does not violate the Sixth Amendment.  *Martinez-Salazar*, 528 U.S. at 313; *Ross v. Oklahoma,* 487 U.S. 81, 88 (1988).

Petitioner's alleged loss of peremptory challenges resulting from the trial court's refusal to dismiss purportedly biased jurors did not violate his Sixth Amendment rights because Petitioner fails to demonstrate that the seated jury was impartial.  *Martinez-Salazar*, 528 U.S. at 313.  After reviewing the voir dire transcripts of the four disputed jurors — Robert Vanwagner, Dovie Cambra, Stanley Wyke[3] and Stephen Higgins —  the Court concludes that the California Supreme Court's determination that these jurors demonstrated an ability to "follow the law and give defendant a fair trial" was reasonable.  *Ervin*, 22 Cal. 4th at 72.

To the extent that Petitioner argues that the trial court's erroneous refusal to dismiss allegedly biased jurors for cause violated his right to due process by depriving him of the full complement of peremptory challenges available to him, this claim too fails because Petitioner fails to establish that he did not receive all that state law afforded him.  The "right to peremptory challenges is denied or impaired [in violation of a defendant's due process rights] only if the defendant does not receive that which state law provides."  *Ross*, 487 U.S. at 89 (internal quotation marks omitted).  Here, Petitioner does not allege that he did not receive all the peremptory challenges allowed under state law.  To the contrary, Petitioner failed to exhaust his available peremptory challenges.  Petitioner fails to establish a due process violation.

---

[3] Petitioner's allegation that the trial court violated his constitutional rights by failing to dismiss Wyke, who expressed racial animus towards Petitioner's African American lead trial counsel, is unavailing.  Wyke's remarks were made during an interview with an investigator long after the verdict.  (Pet'r's App., Ex. 6 at 2-3)  Therefore, the trial judge did not err by not excusing Wyke during jury selection.

United States District Court
Northern District of California

1    The California Supreme Court reasonably denied this claim.   Accordingly, the Court

2    grants Respondent's motion for summary judgment as to claim 3.

3        **D.  Claim 4**

4        In claim four, Petitioner alleges that by allowing the attorneys to dismiss more than 600

5    jurors in extrajudicial proceedings conducted without his presence, the trial court denied him his

6    constitutional right to be present at a critical stage of his proceedings and abdicated its obligation

7    to empanel an impartial jury.  With the agreement of counsel, the trial court developed a screening

8    procedure that allowed counsel to jointly review the prospective jurors' questionnaires and by

9    stipulation screen out the "strong candidates for excusal, i.e., those whose questionnaire answers

10   clearly showed they (1) would automatically vote for death, (2) would never vote for death, or

11   (3) suffered a financial or physical hardship preventing jury service." *Ervin*, 22 Cal. 4th at 72.

12   Under the agreement approved by the trial court, these persons could be excused without

13   conducting any individual voir dire examination.  Although the trial court initially reviewed the

14   excused prospective jurors' questionnaires, it ultimately left counsel to stipulate as to particular

15   excusals.  Petitioner was not present when counsel discussed the questionnaires.  The parties

16   stipulated to the excusal of over 600 prospective jurors, and the trial court then allowed the parties

17   to conduct voir dire of the remaining prospective jurors.  *Id.*

18       Petitioner argues that the above jury screening process violated his right to be present at all

19   critical stages of his proceedings, produced a pro-death penalty jury because many jurors were

20   excluded based on their feelings about the death penalty without any determination of whether

21   their views impaired their ability to be neutral and follow the law, and that this error mandates an

22   automatic reversal of his death sentence.  (ECF Doc. No. 249 at 46-47)  Respondent contends that

23   Petitioner's claim is procedurally defaulted, and also lacks merit because it was reasonably denied

24   by the California Supreme Court.

25       The California Supreme Court addressed and rejected Petitioner's claim on direct appeal as

26   follows:

27           Defendant first contends the excusal procedure tended to produce a
             "pro-death" jury because it allowed counsel to stipulate to excuse
28           prospective jurors based on vague or conflicting questionnaire

United States District Court
Northern District of California

responses, without conducting the usual probing voir dire needed to accurately "death qualify" a jury.   According to defendant, the stipulated procedure resulted in excusing at least 150 prospective jurors whose questionnaire responses were insufficient to justify their exclusion under *Wainwright v. Witt*, supra, 469 U.S. at page 424 [105 S.Ct. at page 852].

Defendant also argues that the questionnaires were inadequate bases for excusing prospective jurors because of hardship, and that an examination of the individual questionnaires shows that many of these persons were excused without meeting any of the "death views" or hardship criteria of the stipulated agreement.   Further, defendant suggests that the trial court "abdicated its responsibility" and violated statutory procedures (see Code Civ. Proc., §§ 223, 230) and "analogous federal standards" by delegating to counsel the task of screening out possibly biased or "hardshipped" prospective jurors.

Finally, defendant argues that the procedure employed for excusing prospective jurors took place outside his presence, violating his statutory and constitutional right to be personally present at all "critical stages" of the proceedings unless he has executed a written waiver of that right.  (See §§ 977, subd. (b), 1043; Cal. Const., art. I, § 15; cf. *Gomez v. United States* (1989) 490 U.S. 858, 872 [109 S.Ct. 2237, 2246, 104 L.Ed.2d 923] [voir dire is critical stage of criminal proceeding].)

None of these arguments have merit. The Attorney General first observes that defendant, through his counsel, stipulated to every aspect of the challenged procedure and further agreed to excuse every prospective juror he now asserts was improperly excused. Accordingly, defendant is barred from raising on appeal defects in the procedure in which he acquiesced.  (See, e.g., *People v. Cudjo* (1993) 6 Cal.4th 585, 627-628 [25 Cal.Rptr.2d 390, 863 P.2d 635] [waiver of defects in death-qualifying voir dire]; *People v. Visciotti* (1992) 2 Cal.4th 1, 38, 41-42 [5 Cal.Rptr.2d 495, 825 P.2d 388] [acquiescence in capital case jury selection procedure]; *People v. Mickey* (1991) 54 Cal.3d 612, 664-665 [286 Cal.Rptr. 801, 818 P.2d 84] [waiver of defects in personal hardship excusal procedures].)  As we stated in *Visciotti*, "counsel acquiesced in the [voir dire] procedure of which defendant now complains.... [ ] ... [ ] ... While the parties are not free to waive, and the court is not free to forego, compliance with the statutory procedures which are designed to further the policy of random selection, equally important policies mandate that criminal convictions not be overturned on the basis of irregularities in jury selection to which the defendant did not object or in which he has acquiesced. [Citations.]" (*People v. Visciotti*, supra, 2 Cal.4th at pp. 37-38; see also Cal. Const., art. VI, § 13 [no reversal for procedural errors absent a "miscarriage of justice"].)

The Attorney General also notes that the stipulated procedure benefited all parties by screening out overzealous "pro-death" as well as "pro-life" venirepersons, and by substantially expediting the jury selection process, "culling out" prospective jurors who probably would have been unable to serve as jurors in any event.   We also observe that, once the preliminary screening process had concluded, the court and counsel then conducted the usual voir dire examination

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

of the remaining prospective jurors in selecting the actual jurors who would serve on defendant's jury.

As for defendant's absence during a preliminary portion of the jury selection process, and his failure to execute a written waiver of his presence, we have held that generally "the accused is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his opportunity to defend the charges against him, and the burden is upon him to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial. [Citation.]" (*People v. Beardslee* (1991) 53 Cal.3d 68, 103 [279 Cal.Rptr. 276, 806 P.2d 1311].) Defendant's presence at counsels' jury screening discussions at issue here would have served little purpose. (*Ibid.*; see *People v. Bradford*, supra, 15 Cal.4th at p. 1357; People v. Holt (1997) 15 Cal.4th 619, 706-707 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. Carpenter* (1997) 15 Cal.4th 312, 377-378 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Grant* (1988) 45 Cal.3d 829, 846 [248 Cal.Rptr. 444, 755 P.2d 894]; but cf. *U.S. v. Gordon* (D.C. Cir. 1987) 829 F.2d 119, 125-127 [264 App.D.C. 334] [defendant's absence from entire jury voir dire deemed reversible error].) Moreover, sections 977 and 1043 do not require the defendant's presence, or a written waiver, unless the standard referred to in *Beardslee* has been met. (*People v. Bradford*, supra, 15 Cal.4th at p. 1357.)

*Ervin*, 22 Cal. 4th at 72-74.

Respondent contends that Petitioner's claim is procedurally defaulted because the California Supreme Court concluded that Petitioner was barred from challenging on appeal the validity of procedures to which he stipulated. *Id.* at 73. As discussed below, assuming that Petitioner's claim is not defaulted, it fails on the merits.

Voir dire is a critical stage of the criminal proceedings during which a defendant has a constitutional right to be present. *Gomez v. United States*, 490 U.S. 858, 873 (1989); *United States v. Sherwood*, 98 F3d 402, 407 (9th Cir. 1996). The Constitution however, is not implicated every time a defendant is excluded from a trial stage. *United States v. Reyes*, 764 F.3d 1184, 1193 (9th Cir. 2014). In *Snyder v. Massachusetts*, 291 U.S. 97, 106-08 (1934), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964), the United States Supreme Court held that a defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge . . . . [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." With respect to voir dire, the United States Supreme Court noted that the "defense may be made easier if the accused is permitted to be

22

present at the examination of jurors . . . for it will be in his power, if present, to give advice or suggestion or even to supersede his lawyers altogether and conduct the trial himself." *Id.* at 106. However, the Court also observed that nowhere in the decisions of the United States Supreme Court is there a ruling that "the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow." *Id.* at 106-107.  The exclusion of a defendant from a trial proceeding should be considered in light of the whole record. *Id.* at 115.  In *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975), the United States Supreme Court reaffirmed the holding of *Snyder*, and observed that "an accused has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings."

Here, although Petitioner was absent from counsel's screening discussions, Petitioner was present during the remainder of the jury selection process and had ample opportunity to observe jurors during voir dire and assist his attorneys in evaluating prospective jurors.  Petitioner fails to establish that his absence during the screening of the jurors' questionnaires frustrated the fairness of his proceedings. *Id.*; *see also Reyes*, 764 F.3d at 1196 (district court's exclusion of defendant from side bar voir dire of prospective juror did not violate defendant's right to be present at every stage of trial).  The California Supreme Court reasonably concluded that Petitioner's presence at the screening discussions would have served little purpose.  *Ervin*, 22 Cal. 4th at 74.

Moreover, as the California Supreme Court pointed out, Petitioner stipulated to every aspect of the challenged jury screening procedure and further agreed to excuse every prospective juror he now claims was improperly excused.  *Ervin*, 22 Cal. 4th at 73.  The California Supreme Court has upheld such waivers.  *See, e.g.*, *People v. Cudjo*, 6 Cal. 4th 585, 627-28 (1993) (through stipulation of counsel, capital defendant waived his right to voir dire every prospective juror individually and in sequestration); *People v. Visciotti*, 2 Cal. 4th 1, 37-38 (1992).  Petitioner fails to cite any authority establishing his waiver to be inadequate.

Finally, Petitioner's contention that the procedure resulted in an impartial jury is unavailing as he fails to establish that it actually resulted in the seating of a biased juror.  As Respondent points out, the fact that some prospective jurors were excused by stipulation has no bearing on the beliefs or prejudices of those who actually served.

United States District Court
Northern District of California

1  For the above-mentioned reasons, the Court grants Respondent's motion for summary

2  judgment as to claim 4.

3  **E.  Claim 5**

4  In claim 5, Petitioner alleges that the prosecutor improperly used 9 of his 15 exercised

5  peremptory challenges to excuse African American prospective jurors in violation of *Batson v.*

6  *Kentucky*, 476 U.S. 79, 89 (1986).  He asserts that 9 of 11 African Americans drawn to serve were

7  improperly challenged, which left just one African American, Harvey Hendrix, seated on the jury,

8  and one African American, Rudolph Wilson, seated as an alternate.  (ECF Doc. No 97 at 99-101).

9  Petitioner argues that in response to defense counsel's challenge under *Batson* and its California

10 analog, *People v. Wheeler*, 22 Cal. 3d 258 (1978), *overruled in part by Johnson v. California*, 545

11 U.S. 162 (2005), the prosecutor offered pretextual justifications for his challenges, and that a

12 comparative juror analysis, which the California Supreme Court erroneously declined to conduct

13 on direct appeal, reflects the prosecutor's differential treatment of comparably situated jurors.

14 Respondent counters that Petitioner's claim was reasonably denied by the California Supreme

15 Court.

16 On direct appeal, the California Supreme Court addressed this claim as follows:

17 The prosecutor used nine of his 15 exercised peremptory challenges
   to excuse African-American prospective jurors.  Defendant made a
18 *Batson/Wheeler* motion (*Batson v. Kentucky* (1986) 476 U.S. 79
   [106 S.Ct. 1712, 90 L.Ed.2d 69]; *People v. Wheeler* (1978) 22
19 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]), asserting the
   prosecutor was improperly using peremptory challenges to exclude
20 African-Americans from the jury.  The trial court, without expressly
   finding that defendant had stated a prima facie case of improper
21 discrimination under these cases, permitted the prosecutor to explain
   his reasons for each exclusion.  After hearing the prosecutor's
22 explanations and defense counsel's responses, the court denied
   defendant's motion, expressly finding that the prosecutor's
23 explanations were "reasonably specific and neutral" and sufficiently
   related to the case, and that defendant demonstrated no prosecutorial
24 "group bias."

25 Defendant's actual jury included only one African-American juror
   and one African-American alternate juror.  Defendant now contends
26 the trial court erred in denying his *Batson/Wheeler* motion.  We find
   no error.

27

28 As we recently stated, we review a trial court's determination
   regarding the sufficiency of a prosecutor's justifications for

24

exercising peremptory challenges "with great restraint. The party seeking to justify a suspect excusal need only offer a genuine, reasonably specific, race or group-neutral explanation related to the particular case being tried. (*People v. Fuentes* [(1991)] 54 Cal.3d 707, 718 [286 Cal.Rptr. 792, 818 P.2d 75]; *People v. Johnson* [(1989)] 47 Cal.3d 1194, 1216 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People v. Hall* (1983) 35 Cal.3d 161, 167-168 [197 Cal.Rptr. 71, 672 P.2d 854]; *see Batson v. Kentucky* (1986) 476 U.S. 79, 97-98, & fn. 20 [90 L.Ed.2d 69, 88-89, 106 S.Ct. 1712].) The justification need not support a challenge for cause, and even a 'trivial' reason, if genuine and neutral, will suffice. (*People v. Montiel* [(1993)] 5 Cal.4th 877, 910, fn. 9 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; Johnson, supra, 47 Cal.3d at p. 1218.) [ ] 'If the trial court makes a "sincere and reasoned effort" to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal....' [Citation.]" (*People v. Arias* (1996) 13 Cal.4th 92, 136 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *see also People v. Williams* (1997) 16 Cal.4th 153, 188-189 [66 Cal.Rptr.2d 123, 940 P.2d 710] [upholding prosecutor's explanation that he had made a "mistake" in challenging African-American prospective juror]; *People v. Johnson*, supra, 47 Cal.3d 1194, 1216-1222 [255 Cal.Rptr. 569, 767 P.2d 1047]; *Tolbert v. Page* (9th Cir. 1999) 182 F.3d 677, 683-685.) The determination whether substantial evidence exists to support the prosecutor's assertion of a nondiscriminatory purpose is a "purely factual question." (*People v. Alvarez* (1996) 14 Cal.4th 155, 197 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

Initially, we observe that, although the trial court failed to find expressly that defendant had presented a prima facie case of improper group discrimination, and indeed expressed doubts such a showing had been made as to six specific prospective jurors, that finding was probably implicit in the court's remarks regarding three other excluded African-Americans and in its invitation to the prosecutor to state his reasons for each of his challenges. (See *People v. Arias*, supra, 13 Cal.4th at p. 135; *People v. Fuentes*, supra, 54 Cal.3d 707, 716-717, & fn. 5 [286 Cal.Rptr. 792, 818 P.2d 75].)

As the trial court ruled, the prosecutor expressed reasonably specific and neutral reasons, although not particularly logical or substantial ones, for excusing each prospective juror. For example, regarding the three excusals on which the trial court focused, the prosecutor observed that (1) the defense accepted Roslyn R. without asking her a single question, drawing the prosecutor's suspicions regarding her neutrality; (2) Caroline M. was nervous and shaking during her interrogation, indicating the possibility she might be taking drugs; also, her occupation as juvenile counselor with a belief in rehabilitation might induce her to reject the death penalty; and (3) Eloise K. was a Bible college student who, at one point in her voir dire examination, indicated reluctance to impose the death penalty.

Defendant disputes the sufficiency of these explanations and likewise questions the adequacy or plausibility of the prosecutor's responses regarding several other excluded prospective jurors, including (1) Alfred H., whom the prosecutor characterized as "an NRA member" with a "deeply religious bent," not likely to favor the

death penalty; (2) JoAnn W., who also supposedly also had a "religious bent" that might preclude her favoring the death penalty; (3) Lionel J., who had a "drug history" and was "weak" on the death penalty; (4) Lisa K., who the prosecutor believed was too young (age 25) and who seemed too sympathetic to defendant McDonald; and (5) James T., also too young (age 21) and appearing too eager to remain on the jury despite both holding a job and attending classes.

Although defendant asserts that the prosecution's reasons for excluding these persons were inadequate, a sham, or unsupported by the record, nevertheless, as we previously explained, if the trial court makes a 'sincere and reasoned effort' to evaluate the nondiscriminatory justifications the prosecutor offers, the court's conclusions are entitled to deference on appeal if supported by substantial evidence. (*People v. Arias*, *supra*, 13 Cal.4th at p. 136.) Our examination of the record convinces us the court made such an effort.

Defendant contends the prosecutor improperly excused prospective jurors Alfred H., JoAnn W., and Eloise K. based on a "blanket characterization regarding religious persons" amounting to invidious discrimination. To the contrary, as the prosecutor explained, he excused these persons because he perceived they had a "religious bent" or bias that would make it difficult for them to impose the death penalty, a proper, nondiscriminatory ground for making a peremptory challenge. (See, e.g., *People v. Jones* (1997) 15 Cal.4th 119, 164-165 [61 Cal.Rptr.2d 386, 931 P.2d 960]; *People v. Pride* (1992) 3 Cal.4th 195, 230 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

Defendant, citing cases from other jurisdictions employing a "comparative analysis" approach, maintains that several of the prosecutor's explanations for excusing African-Americans were inconsistent with his actions in accepting various non-African-Americans who gave similar voir dire responses as prospective jurors. The rule is clear in this state, however, that in evaluating the sufficiency of the prosecutor's explanations, a reviewing court will not engage in such a comparative analysis regarding persons the prosecutor accepted. (*People v. Jones*, *supra*, 15 Cal.4th at p. 162; *People v. Arias*, supra, 13 Cal.4th at p. 136, fn. 16; *People v. Johnson*, supra, 47 Cal.3d at p. 1221.) We see no compelling reason to reconsider those holdings here.

Defendant also complains that the trial court "supplemented" the prosecutor's explanations regarding several other excused prospective jurors with additional justifications drawn from their voir dire testimony. (See *People v. Fuentes*, *supra*, 54 Cal.3d at p. 720 [prosecutor's explanations must be found to have "actually prompted" exercise of peremptory challenge].) We agree with defendant that ordinarily the court should not attempt to bolster a prosecutor's legally insufficient reasons with new or additional factors drawn from the record, but we are not convinced the prosecutor's stated reasons in this case were legally insufficient.

Even seemingly "'highly speculative'" or "'trivial'" grounds may support the exercise of a peremptory challenge. (*People v. Williams*, supra, 16 Cal.4th at p. 191; *People v. Johnson*, *supra*, 47 Cal.3d at p.

1  1218; see *Purkett v. Elem* (1995) 514 U.S. 765, 768 [115 S.Ct. 1769,

2  1771, 131 L.Ed.2d 834].)   As we stated in *Johnson*, "What is
required are reasonably specific and neutral explanations that are

3  related to the particular case being tried." (*People v. Johnson*, supra,
47 Cal.3d at p. 1218.)  Here, the trial judge saw and heard the entire

4  voir dire proceedings and found the prosecutor made no improper
use of peremptory challenges.  As in *Johnson*, "Under these

5  circumstances we see no good reason to second-guess his factual
determination." (*Id.* at p. 1221, fn. omitted.)  In sum, as we noted in
*People v. Williams*, supra, 16 Cal.4th at page 190, "The trial judge's

6  findings ..., largely turning on evaluations of credibility, are entitled
to great deference. [Citations.]"

7  *Ervin*, 22 Cal. 4th at 74-77.

8        In *Batson*, 476 U.S. at 89, the United States Supreme Court held that "the Equal Protection

9  Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the

10  assumption that black jurors as a group would be unable impartially to consider the State's case

11  against a black defendant."  A *Batson* challenge has a three-step inquiry.  First, the trial court must

12  determine whether the defendant has made a *prima facie* showing that the prosecutor exercised a

13  peremptory challenge on the basis of race by showing that the totality of the relevant facts gives

14  rise to an inference of discriminatory purpose.  *Id.* at 93-94.  Second, if the showing is made, the

15  burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in

16  question.  *Id.* at 97.  "The second step of this process does not demand an explanation that is

17  persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767-78 (1995).  Unless a

18  discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral.

19  *Id.*  Third, the court must determine whether the defendant has carried his burden of proving

20  purposeful discrimination.  *Batson*, 476 U.S. at 98.  "It is not until the third step that the

21  persuasiveness of the justification becomes relevant." *Purkett*, 514 U.S. at 768.  To decide

22  whether the defendant has met his burden, the court must "undertake a sensitive inquiry into such

23  circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93.  This

24  inquiry includes comparing African-American panelists who were struck with those non-African

25  American panelists who were allowed to serve. *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir.

26  2012).  "If a prosecutor's proffered reason for striking a black panelist applies just as well to an

27  otherwise similar non-black who is permitted to serve, that is evidence tending to prove purposeful

28  discrimination to be considered at *Batson's* third step." *Miller-El v. Dretke*, 545 U.S. 231, 241

United States District Court
Northern District of California

1   (2005).

2        A state court's finding that the prosecutor did not engage in purposeful discrimination is

3   reviewed under the deferential standard set forth in 28 U.S.C. § 2254(d)(2).  *Jamerson v. Runnels*,

4   713 F.3d 1218, 1224 (9th Cir. 2013).  "Thus, the state court's decision will be upheld unless it was

5   'based on an unreasonable determination of the facts in light of the evidence presented in the State

6   court proceeding.'"  *Id.* (citing 28 U.S.C. § 2254(d)(2)).   In evaluating *Batson* claims presented in

7   habeas petitions, a "doubly deferential standard" applies: "unless the state appellate court was

8   objectively unreasonable in concluding that a trial court's credibility determination was supported

9   by substantial evidence, we must uphold it . . .  This is because the question of discriminatory

10  intent largely will turn on evaluation of credibility and evaluation of the prosecutor's state of mind

11  based on demeanor and credibility evidence lies peculiarly within a trial judge's province."  *Id.* at

12  1225 (internal quotation marks and citations omitted).

13       Where a state court declined to conduct a comparative juror analysis, the evaluation of the

14  state court's disposition proceeds in two steps:

> To begin, we must perform in the first instance the comparative analysis that the state court declined to pursue. Then, we must reevaluate the ultimate state decision in light of this comparative analysis and any other evidence tending to show purposeful discrimination to decide whether the state was unreasonable in finding the prosecutor's race-neutral justifications to be genuine. In essence, we must assess how any circumstantial evidence of purposeful discrimination uncovered during comparative analysis alters the evidentiary balance and whether, considering the totality of the evidence, the state court's credibility determination withstands our doubly deferential review.

21  *Id.* at 1225-26.

22       Here, Petitioner alleges that the prosecutor improperly challenged prospective jurors

23  Caroline Mullen, Lionel Jackson, Pamela Blake, Alfred Hudnall, JoAnn White, Eloise Knox, Lisa

24  Kelley, James Thomas III and Roslyn Roberts based on race.  In particular, he asserts that a

25  comparative juror analysis reveals that the prosecutor's explanations for challenging three jurors,

26  Lisa Kelley, James Thomas III and Roslyn Roberts, were inconsistent with his actions in accepting

27  non-African Americans who gave similar responses.  (ECF Doc. No. 249 at 50-51)

28       The prosecutor justified his peremptory challenges, by stating at the outset, that his

United States District Court
Northern District of California

challenges of *all* of the jurors, were based on their specific "attitudes regarding the death penalty." RT 9064.  He then proceeded to provide additional individual justifications as follows:

1) Lisa Kelley, age 25, was characterized as "too young."  The prosecutor believed that getting her to impose the death penalty would be an "uphill battle."  RT 9065.

2) James Thomas, age 21, was also deemed young and appeared too eager to remain on the jury despite holding a job and attending classes.  RT 9065-66.

3) Caroline Mullen was suspected of being on drugs because she appeared nervous and shook during questioning.  RT 9066.  Additionally, the prosecutor believed that her occupation as a juvenile counselor with a belief in rehabilitation might lead her to reject the death penalty.  *Id.*  She had "this look about her" that the prosecutor could not figure out.  *Id.*

4) Pamela Blake, the vice president of Richmond High School, was characterized as an arrogant woman who probably wouldn't get along with the rest of the jury.  RT 9067.  She also failed to appear in court for traffic tickets, leading the prosecutor to state: "[S]omeone who is not able to take care of traffic violations and lets them go to 408 traffic warrants shows to me she is not the type of juror I want on the jury and would be a potential hang on the death penalty."  *Id*.

5) Lionel Jackson concealed an arrest, had a drug history and was "weak" on the death penalty.  RT 9067.

6) Eloise Knox was described as a "biblical college student", who the prosecutor believed would never "gas anybody."  RT 9067.  She and Mother Theresa would "fit hand in hand."  *Id.*

7) Roslyn Roberts was not asked a single question by Petitioner's counsel, so the prosecutor was worried that Petitioner's counsel saw something in Roberts that the prosecutor did not.  RT 9067-68.

8) Alfred Hudnall was characterized as a "43 year old wild card . . . a guy who owns weapons and belongs to the NRA, but he has also a deeply religious bent.  He is not pro death penalty."  RT 9068.

United States District Court
Northern District of California

9) JoAnn White indicated in her questioning that she would listen to factors in mitigation and make her decision "partly upon what she heard in the penalty phase." *Id.* The prosecutor worried that by "partly," she meant that her religious conviction would prevent her from voting for the death penalty. *Id.*

As noted above, in reviewing Petitioner's *Batson* challenge on direct appeal, the California Supreme Court noted that even speculative or trivial grounds may support the exercise of a peremptory challenge, and observed that the trial judge, after hearing the entire voir dire, found that the prosecutor did not raise any improper challenges. *Ervin*, 22 Cal. 4th at 77. Under the circumstances, the California Supreme Court saw no good reason to second-guess the trial judge's factual determinations. *Id*.

With respect to 6 of the 9 challenged African American jurors, namely Caroline Mullen, Lionel Jackson, Pamela Blake, Alfred Hudnall, JoAnn White and Eloise Knox, Petitioner broadly alleges that the prosecutor improperly challenged them, but fails to advance specific arguments. In fact, his opposition does not even address the challenges of these six jurors. (ECF Doc. No. 249 at 48-53). As previously noted, state court factual findings are presumed correct; the petitioner has the burden of rebutting the presumption by "clear and convincing evidence." *Rice v. Collins*, 546 U.S. 333, 338-39 (2006); *Briggs*, 682 F.3d at 1171. Here, Petitioner fails to meet this burden. Petitioner thus fails to establish that the state trial court was unreasonable to credit the prosecutor's race-neutral explanations for the peremptory challenges of the 6 jurors at issue. *Rice*, 546 U.S. at 338-39 (federal habeas court can only grant petition if it was unreasonable to credit the prosecutor's race-neutral explanations for *Batson* challenge).

Petitioner instead focuses his arguments on the challenges of James Thomas III, Lisa Kelley and Roslyn Roberts. Petitioner claims that a comparative analysis of these jurors demonstrates that the prosecutor's justifications were pretextual. As discussed below, Petitioner's arguments with respect to these three jurors are also unavailing.

### 1.   James Thomas

Petitioner argues that the prosecutor's justification for the challenge of James Thomas — namely that he was "too young" and appeared too eager to forsake work and school to serve on the

jury—was pretextual because the prosecutor did not express the same concern when white jurors indicated they would work evenings or not attend school in order to accommodate jury service. (ECF Doc. No. 249 at 50)  Petitioner also states that a number of young non-African American jurors expressed a desire to be on the jury, and some were seated.  *Id.*

The record confirms that Thomas was a full-time college student whose classes started at around 9:00 a.m. and ended at 1:50 or 2:00 p.m., and that he worked at Macy's as a junior executive in the evenings.  RT 1334-35, 1365.  Petitioner fails, however, to identify any of the non-African American jurors he claims were also too young and would have had to juggle school and work in order to accommodate jury service, let alone demonstrate that they faced an equally busy schedule.  Petitioner merely raises conclusory allegations that unspecified jurors who were similarly situated to Thomas were seated.  Petitioner fails to meet his burden of rebutting the state court's factual findings.  *See Briggs*, 682 F.3d at 1171 (burden of disproving state court's factual findings by clear and convincing evidence rests with petitioner).

Furthermore, Thomas stated that on the prosecutor's "Rambo" scale of 1-10, with one being "not very pro death penalty," and ten representing "Rambo, somebody who'd shoot up everything," he gave himself a three.  RT 1348.  This supports the prosecutor's stated reason that his challenges of *all* of the jurors, were based on their specific "attitudes regarding the death penalty."  RT 9064.  Indeed, the trial judge, in finding the prosecutor's justification valid, stated:

> James Thomas, again, full-time student, very young.  3 on a scale of 10, as I recall on [the prosecutor's] Rambo scale.  Again, no disrespect intended, but from the court's point of view, not even close.

RT 9075.  Based on this Court's review of the record, it was not unreasonable for the California Supreme Court to find that substantial evidence supported the trial court's determination that the prosecutor challenged Thomas for race-neutral, legitimate reasons.  *See Briggs*, 682 F.3d at 1172 (based on review of record, California Court of Appeal's finding that substantial evidence supported trial court's determination that prosecutor challenged prospective juror for legitimate reasons was reasonable).

United States District Court
Northern District of California

31

United States District Court
Northern District of California

### 2.  Lisa Kelley

Petitioner further alleges that the prosecutor's justification for the challenge of Lisa Kelley—particularly that it would be an uphill battle to get her to impose the death penalty on McDonald—was pretextual because the prosecutor did not challenge Kimberly Goodman, even though she was similarly disinclined to impose death on McDonald.  (ECF Doc. No. 249 at 51)

The record reveals that Kelley expressed equivocal views vis a vis the death penalty on voir dire.  While Kelley asserted a general ability to impose the death penalty, *see, e.g.*, RT 2746 ("Q: Do you think you could ever vote to impose the death penalty on another person . . . ?  A: Yes, generally speaking"),  *see also* RT 2762, Kelley equivocated when asked whether it was possible for her to vote for death in a murder-for-hire situation where the hirer had no prior criminal history and did not participate in the murder.  She twice stated that she was uncertain as to whether she could vote for death in such a situation, *see* RT 2765 ("Q: Do you think that you . . . could ever, knowing that Mr. McDonald did not personally kill his ex-wife, could you ever consider the death penalty as to him?  A: I don't know.  I'd have to know more"), *see also* RT 2767.  Kelley changed her mind, however, on further questioning.  *See, e.g.*, RT 2769 ("Q: Are you saying that in considering that evidence, even though there were no other aggravating circumstances, that all you had . . . [was] the fact that he hired two people to kill his wife, are you saying that based on that evidence by itself . . . that you could consider the death penalty as to Mr. McDonald?  A: Yes.")  Additionally, Kelley expressed some misgivings about the criminal justice system, stating that: "I feel that it is effective except that not everyone gets the punishment or even gets caught for things that they do."  RT 2778.

In assessing the prosecutor's justification of his challenge of Kelley, the trial judge stated:

> As far as Kelley is concerned, that was a close call on the cause challenge, and it was out of an abundance of caution that I denied it. And I think she clearly was—at least she was very shaky as to whether she could vote for the death penalty.  I have in mind Mr. Anderson's comments.  Nothing more need be said about her.

RT 9075.

Similarly to Kelley, Goodman initially expressed doubt about her ability to impose death on someone like McDonald, who did not participate in the actual killing of the victim.  *See, e.g.*,

32

United States District Court
Northern District of California

RT 3405 ("Q: Can you see yourself voting for death for Mr. McDonald?  A: No . . ."), *see also* RT 3407.  On further questioning, however, Goodman repeatedly and firmly reaffirmed her ability to impose death on the hirer in a murder for hire case.  *See* RT 3411 ("The Court: We don't want to know how you would vote.  We want to know if . . . [the death penalty] would remain an option.  Prospective Juror Goodman: It would remain an option."); *see also* RT 3409-3413.  Moreover, Goodman stated that if the death penalty were on the ballot during an election, she would vote for it because it serves as a deterrent and promotes safety.  RT 3400-02.  Additionally, Goodman stated that her father was a highway patrol officer.  RT 3415.  This may have made her a desirable juror for the prosecution.

Overall, when the totality of the evidence is considered, the state court's credibility determination with respect to the prosecutor's justification for striking Kelley withstands the applicable doubly deferential standard of review.  *Jamerson*, 713 F.3d at 1225-26 ("we must assess how any circumstantial evidence of purposeful discrimination uncovered during comparative analysis alters the evidentiary balance and whether, considering the totality of the evidence, the state court's credibility determination withstands our doubly deferential review.")  As explained by the Ninth Circuit in *Aleman v. Uribe*, 723 F.3d 976, 983 (9th Cir. 2013), "[o]ne level of deference arises from the broad power of a trial court to assess credibility of the prosecutor's statements that were made in open court. Another level of deference arises from the AEDPA context where we defer to state court decisions that are not objectively unreasonable."  Here, Petitioner has not set forth sufficient evidence to supercede the trial court's credibility determination.  *Jamerson,* 713 F.3d at 1230 (even though prosecutor's reason for excusing juror was not compelling, evidence was insufficient to supercede trial court's credibility determination under doubly deferential standard).

### 3.   Roslyn Roberts

Petitioner argues that the prosecutor's justification for the challenge of Roslyn Roberts, namely that he struck her because Petitioner's counsel did not ask her any questions, is pretextual because the prosecutor did not challenge white jurors, such as Robert Kelleher and Robert Vanwagner, who similarly were not questioned by the defense.  (ECF Doc. No. 249 at 51, Doc.

33

No. 97 at 124).  Kelleher and Vanwagner were eventually seated as jurors.

Roberts, a registered nurse who dealt with crack babies, RT 8264-65, rated herself a "5" on the prosecutor's "Rambo" scale.  RT 8256.  The prosecutor justified his challenge of Roberts as follows:

> She said claimed she could gas, if we ever got to the penalty.  But I noticed that [Petitioner's counsel] asked her not one single question.  I don't know whether they figured they had her locked up or whether they saw something in her I didn't.  That's a situation I can't possibly take a chance, ergo the challenge as to Miss Roberts.

RT 9068.  The trial court assessed the prosecutor's justification as follows:

> Roberts, I think I probably would have asked for an explanation as to Roslyn Roberts.  We have one and I think it has been satisfactory.

> I do note, initially—that was a person who was, initially, 20 minutes late.  That may or may not mean anything, may not play any role in Mr. Anderson's challenge.  She was 20 minutes late.  We had to wait for her.

> She, among other things, indicated that she deals with crack babies.  Might have—she might discount testimony from a crack user simply because they are users.  Those are my words.  But that's what I take from her answers.

> Again, I may have required an explanation.  I feel that the explanation that the district attorney gave, his reasons, I find are satisfactory and I'm just supplementing it with my own observations.

RT 9078.

The record reveals that Petitioner's counsel, Thomas Broome and Gail Brewster Hardy, indeed declined to ask Roberts questions.  RT 8253-54 (Mr. Broome: "You wouldn't be terribly offended if I didn't ask you any questions?")  Roberts was, however, amply questioned by Petitioner's codefendants' counsel.  The record further confirms that Petitioner's counsel similarly declined to question Vanwagner and Kelleher.  RT 8695, 7024.

It is questionable, however, whether Kelleher and Vanwagner were similarly situated jurors as Roberts.  *See, e.g., Jamerson*, 713 F.3d at 1230-31 (two jurors not similarly situated where prosecutor was aware of the conviction of the siblings of one of the jurors, but not the other).  Vanwagner had been the head teacher in juvenile hall, an insurance executive and a writer

34

for television.  RT 7030.  Kelleher had been a salesman and also worked for New York Life as manager of accounting.  RT 8706-07.  Neither one of them worked in occupations involving the provision of medical treatment to crack babies, or dealt intimately with users of cocaine such as Petitioner, as did Roberts.  *See, e.g.*, RT 8255.  The prosecutor could have reasonably viewed Petitioner's counsel's failure to ask Kelleher and Vanwagner questions differently from their failure to ask Roberts questions.  In fact, the prosecutor himself asked Roberts whether her experience with users of cocaine would influence her views of the testimony of witnesses who used cocaine.  RT 8265-66.  These jurors may reasonably not have been similarly situated from the prosecutor's perspective.

Even if the prosecutor's justification for the lack of questioning by Petitioner's counsel were to be discredited, his alternate justification, namely the challenged jurors' "attitudes regarding the death penalty" remains.  RT 9064.  While Roberts, in many instances, asserted an ability to impose the death penalty, *see, e.g.*, RT 8246, 8247, and as noted above, rated herself a "5" on the prosecutor's "Rambo" scale, she also made statements that qualified her views. Roberts stated that she would accept as a mitigating factor that the defendant "had a life prior to that incident.  Sometimes turn of events cause people to just flip [out]."  RT 8250.  This statement suggests that she may have proved to be receptive to a defense theory that Petitioner "flipped out" as a result of his cocaine addiction, or that she might be reluctant to impose the death penalty on McDonald, whose conduct was likely to be portrayed as an aberration from an otherwise exemplary life.  Roberts also stated that a person's use of cocaine has psychological ramifications that have to be taken into account: ". . . [U]nderstanding the psychological ramifications of coke —I don't mean coke—crack cocaine, you have to kind of take that into account; not saying that that person is totally irresponsible to the fact, but, you know, you really have to take it into account."  RT 8265.  This response suggests receptivity to the defense's likely mitigation theory.

Overall, even though the prosecutor's reasons for challenging Roberts may not have been compelling, Petitioner has not set forth sufficient evidence to supercede the trial court's credibility determination under the applicable doubly-deferential standard of review.  *Jamerson*, 713 F.3d at 1230 (although reasonable minds may disagree about prosecutor's credibility, evidence was

35

insufficient to supercede trial court's credibility determination under doubly deferential standard). Considering the totality of the evidence, the state court's credibility determination withstands doubly deferential review.  *Id.* at 1225-26.  The California Supreme Court was not unreasonable in concluding that the prosecutor's justification for challenging Roberts was genuine.

For the above-mentioned reasons, summary judgment on claim 5 is granted.

### F.  Claim 6

In claim 6, Petitioner alleges that the trial court violated his constitutional rights by failing to voir dire jurors regarding a sensational news article appearing in the *Oakland Tribune* on the morning of final jury selection regarding the exorbitant cost of his trial.  In his opposition, Petitioner references, without citation to the record, two juror affidavits submitted in support of this claim, which purportedly demonstrate prejudice resulting from the lack of voir dire regarding the article.  (ECF Doc. No. 249 at 54)  Respondent similarly references these affidavits without citation to the record, stating instead that the affidavits accompanied the habeas petition that Petitioner submitted to the California Supreme Court.  (ECF Doc. No. 213 at 41)  Based on the Court's review of the record, these affidavits do not appear to have been filed in support of Petitioner's federal habeas petition.

As further directed below, the Court defers ruling on claim 6 until after Petitioner files a copy of these affidavits.

## VI.  CONCLUSION

The Court hereby ORDERS as follows:

(1) Summary judgment with respect to claims 1, 2, 3, 4 and 5 is GRANTED.

(2) Within 21 days of the date of this Order, Petitioner shall file a statement clarifying whether the affidavits mentioned in claim 6 have, in fact, been filed in support of his federal petition, and if so, shall provide a full citation to the record.  Petitioner shall also file another copy of the affidavits.  The Court defers ruling on claim 6 until after the affidavits are filed.

United States District Court
Northern District of California

1         IT IS SO ORDERED.

2    DATED:  December 11, 2015

3

_____

4    LUCY H. KOH
UNITED STATES DISTRICT COURT

United States District Court
Northern District of California