United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| CURTIS LEE ERVIN,<br><br>            Petitioner,<br><br>    v.<br><br>RON DAVIS, Warden, California State Prison at San Quentin,<br><br>           Respondent. | Case No. 00-CV-01228-LHK<br><br>**ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS 26 AND 27**<br><br>Re: Dkt. No. 213 |

In 1991, Petitioner Curtis Lee Ervin ("Petitioner") was convicted of the murder of Carlene McDonald and sentenced to death. On September 7, 2007, Petitioner filed an amended petition for a writ of habeas corpus before this Court, which included 37 claims in total. ECF No. 97 ("Pet."). Respondent has moved for summary judgment on all 37 claims in Petitioner's habeas petition. ECF No. 213 ("Mot."). Petitioner opposes Respondent's motion and requests an evidentiary hearing on 15 of Petitioner's 37 claims. The Court has ruled on 32 of the 37 claims.

This Order addresses claims 26 and 27 in Petitioner's amended habeas petition, which pertain to the alleged ineffective assistance of Petitioner's trial counsel. Petitioner requests an evidentiary hearing on both claims 26 and 27. For the reasons discussed below, Respondent's

1  motion for summary judgment as to claims 26 and 27 is GRANTED, and Petitioner's request for

2  an evidentiary hearing as to claims 26 and 27 is DENIED.

3  **I.      BACKGROUND**

4      **A.  Factual Background[1]**

5         On February 21, 1991, a jury convicted Petitioner of first degree murder with the special

6  circumstance finding of murder for financial gain.  Evidence presented at Petitioner's trial

7  established that Robert McDonald ("McDonald"), the former spouse of Carlene McDonald

8  ("Carlene"), had hired Petitioner and Arestes Robinson ("Robinson"), to kill Carlene for $2,500.

9         At trial, Armond Jack ("Jack") testified that he had driven with Petitioner to meet

10  McDonald to negotiate the price for killing Carlene.  Jack also testified that he had driven

11  Petitioner and Robinson to Carlene's apartment on November 7, 1986, the night of the murder.

12  While Petitioner, Robinson, and Jack were driving to Carlene's apartment, Petitioner asked for

13  and received a knife from Robinson.  With the assistance of a BB gun, Petitioner and Robinson

14  kidnapped Carlene and used Carlene's vehicle to take Carlene to Tilden Park, where Petitioner

15  stabbed Carlene to death with Robinson's assistance.  A patrol officer found Carlene's body the

16  following afternoon.

17         Petitioner and Robinson met with McDonald the day after Carlene's murder and presented

18  McDonald with Carlene's driver's license as proof of the murder.  McDonald paid Petitioner

19  $2,500, which Petitioner shared with Robinson and others to purchase cocaine.  A few weeks after

20  Carlene's murder, McDonald paid Petitioner an additional $1,700.  Sharon Williams ("Williams"),

21  Petitioner's girlfriend, testified that Petitioner gave her a watch and ring later identified as

22  belonging to Carlene.  Petitioner also retained Carlene's vehicle, parking it and seeking to have it

23  stripped, cleaned, or burned shortly after the murder.

24         In addition to the physical evidence linking Petitioner to Carlene's murder, Petitioner also

25

26  ───────────────

[1] The following facts are drawn from the California Supreme Court's opinion on Petitioner's
direct appeal.  *People v. Ervin*, 990 P.2d 506, 513–14 (Cal. 2000); *cf. Miller-El v. Cockrell*, 537

27  U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear
and convincing evidence to the contrary.").

28                                     2

United States District Court
Northern District of California

admitted various incriminating aspects of the crime to David Willis ("Willis"), Zane Sinnott ("Sinnott"), and the investigating police officer, Sergeant Dana Weaver ("Weaver").  According to these witnesses, Petitioner admitted that he and Robinson had confronted Carlene, had pointed the BB gun at her, had forced her into her car, and had driven her to Tilden Park.  Petitioner further admitted to stabbing Carlene to death at Tilden Park while Robinson held her.  The prosecution also introduced testimony from Robinson's girlfriend, Gail Johnson ("Johnson"), who stated that Robinson had admitted to participating in Carlene's murder.

Robinson, McDonald, and Petitioner were tried together.  Petitioner made no claims of innocence, but sought to impeach the testimony of prosecution witnesses Jack, Sinnott, and Willis. In addition, Dr. Fred Rosenthal ("Rosenthal"), a psychiatrist, testified that Petitioner's cocaine consumption might have impaired Petitioner's thought process and that Petitioner thus did not appreciate the seriousness and finality of killing someone for money.  The jury found Petitioner's defenses unavailing and convicted Petitioner of first degree murder.

During the penalty phase of Petitioner's trial, the prosecution introduced evidence of a prior bank robbery conviction and some jail disciplinary problems.  Petitioner introduced mitigating evidence regarding his upbringing, character, employment, family, drug use, religious involvement, and musical skills.  McDonald and Robinson also introduced mitigating evidence. The jury returned death verdicts for Petitioner and McDonald, but chose life imprisonment without parole for Robinson.

### B.  Procedural History

On January 6, 2000, the California Supreme Court affirmed Petitioner's conviction and sentence on direct appeal.  *People v. Ervin*, 990 P.2d 506, 537 (Cal. 2000).  The United States Supreme Court denied a petition for a writ of certiorari on October 2, 2000.  *Ervin v. California*, 531 U.S. 842 (2000).  On November 12, 2002, Petitioner filed a federal habeas petition.  ECF No. 32.  On January 22, 2003, Petitioner filed a corrected federal habeas petition.  ECF No. 45.  That same day, all federal habeas proceedings were stayed so that Petitioner could exhaust his claims in state court.  Petitioner filed a state habeas petition on October 1, 2003, and on December 14, 2005,

Case No. 00-CV-01228-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS 26 AND 27

1   the California Supreme Court denied Petitioner's state habeas petition.

2        Following the California Supreme Court's decision, Petitioner filed an amended federal

3   habeas petition.  ECF No. 97.  Respondent filed a response on March 7, 2008, ECF No. 110, and

4   Petitioner filed a traverse on November 13, 2008.  ECF No. 133.

5        On February 14, 2012, Respondent filed the instant motion for summary judgment.  On

6   January 8, 2013, Petitioner filed an opposition and a request for an evidentiary hearing on claims

7   7–10, 19–20, 25–30, and 32–34.  ECF No. 249 ("Opp'n").  Respondent filed a reply on May 10,

8   2013, which included an opposition to Petitioner's request for an evidentiary hearing. ECF No.

9   259 ("Resp. Reply").  On August 16, 2013, Petitioner filed a reply to Respondent's opposition to

10  Petitioner's request for an evidentiary hearing.  ECF No. 266 ("Pet. Reply").

11       On January 7, 2015, the instant action was reassigned from U.S. District Judge Claudia

12  Wilken to the undersigned judge.  ECF No. 268.  On March 16, 2015, the Court stayed

13  Petitioner's penalty phase claims pending the Ninth Circuit's decision in *Jones v. Chappell*, 31 F.

14  Supp. 3d 1050 (C.D. Cal. 2014).  ECF No. 269.  The Ninth Circuit decided *Jones* on November

15  12, 2015, and determined that the district court had erred in finding California's post-conviction

16  system of review unconstitutional.  *Jones v. Davis*, 806 F.3d 538 (9th Cir. 2015).  In the wake of

17  the Ninth Circuit's *Jones* decision, all of Petitioner's claims are now ripe for review.

18       On December 11, 2015, this Court issued an order granting Respondent's motion for

19  summary judgment as to claims 1–5.  ECF No. 271.  On March 28, 2016, this Court issued an

20  order granting Respondent's motion for summary judgment as to claims 14–15 and 17–18.  ECF

21  No. 281.  On March 29, 2016, this Court issued an order granting Respondent's motion for

22  summary judgment as to claims 7–13.  On June 14, 2016, this Court issued an order granting

23  Respondent's motion for summary judgment as to claims 21, 35, and 36.  ECF No. 283.  On June

24  15, 2016, this Court issued an order granting Respondent's motion for summary judgment as to

25  claims 6 and 16.  ECF No. 284.  On June 16, 2016, this Court issued an order granting

26  Respondent's motion for summary judgment as to claims 22 and 23.  ECF No. 285.  On July 8,

27  2016, this Court issued an order granting Respondent's motion for summary judgment as to claims

28

Case No. 00-CV-01228-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS 26 AND 27

United States District Court
Northern District of California

32 and 33.  ECF No. 286.  On August 15, 2016, this Court issued an order granting Respondent's

motion for summary judgment as to claims 28 and 29.  ECF No. 287.  On August 17, 2016, this

Court issued an order granting Respondent's motion for summary judgment as to claims 24 and

31.  ECF No. 288.  On September 1, 2016, this Court issued an order granting Respondent's

motion for summary judgment as to claims 19, 20, and 30.  ECF No. 289.

## II.    LEGAL STANDARD

### A.    Antiterrorism and Effective Death Penalty Act (28 U.S.C. § 2254(d))

Because Petitioner filed his original federal habeas petition in 2002, the Anti-Terrorism

and Effective Death Penalty Act of 1996 ("AEDPA") applies to the instant action.  *See Woodford*

*v. Garceau*, 538 U.S. 202, 210 (2003) (holding that AEDPA applies whenever a federal habeas

petition is filed after April 24, 1996).  Pursuant to AEDPA, a federal court may grant habeas relief

on a claim adjudicated on the merits in state court only if the state court's adjudication "(1)

resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States; or (2) resulted

in a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."  28 U.S.C. § 2254(d).

### 1.    Contrary To or Unreasonable Application of Clearly Established Federal Law

As to 28 U.S.C. § 2254(d)(1), the "contrary to" and "unreasonable application" prongs

have separate and distinct meanings.  *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("Section

2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas

relief with respect to a claim adjudicated on the merits in state court.").  A state court's decision is

"contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to

that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case

differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts."  *Id*. at

412–13.

A state court's decision is an "unreasonable application" of clearly established federal law

if "the state court identifies the correct governing legal principle . . . but unreasonably applies that

principle to the facts of the prisoner's case." *Id.* at 413.  "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  A state court's determination that a claim lacks merit is not unreasonable "so long as 'fairminded jurists could disagree' on [its] correctness." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Holdings of the U.S. Supreme Court at the time of the state court decision are the sole determinant of clearly established federal law. *Williams*, 529 U.S. at 412.  Although a district court may "look to circuit precedent to ascertain whether [the circuit] has already held that the particular point in issue is clearly established by Supreme Court precedent," *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (per curiam), "[c]ircuit precedent cannot refine or sharpen a general principle of [U.S.] Supreme Court jurisprudence into a specific legal rule," *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (per curiam) (internal quotation marks omitted).

## 2.   Unreasonable Determination of the Facts

In order to find that a state court's decision was based on "an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record before the state court," *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (internal quotation marks omitted).  "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).  That said, "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

In examining whether a petitioner is entitled to federal habeas relief, a federal court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  In the event that a federal court

6

United States District Court
Northern District of California

"determine[s], considering only the evidence before the state court, that the adjudication of a claim on the merits resulted in a decision contrary to or involving an unreasonable application of clearly established federal law, or that the state court's decision was based on an unreasonable determination of the facts," the federal court evaluates the petitioner's claim *de novo*. *Hurles*, 752 F.3d at 778. If error is found, habeas relief is warranted if that error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). Petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)).

**B. Federal Evidentiary Hearing (28 U.S.C. § 2254(e))**

Under *Cullen v. Pinholster*, habeas review under AEDPA "is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. at 180–81. The Ninth Circuit has recognized that *Pinholster* "effectively precludes federal evidentiary hearings" on claims adjudicated on the merits in state court. *Gulbrandson v. Ryan*, 738 F.3d 976, 993 (9th Cir. 2013); *see also Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) ("Although the Supreme Court has declined to decide whether a district court may ever choose to hold an evidentiary hearing *before* it determines that § 2254(d) has been satisfied . . . an evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.") (internal quotation marks and citation omitted).

**C. Summary Judgment**

Summary judgment is appropriate if, when viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559–60 (2006). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to

1   a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in

2   favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

3       The moving party bears the initial burden of identifying those portions of the pleadings,

4   discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*

5   *Corp.*, 477 U.S. at 323.  Whereas the party opposing summary judgment will have the burden of

6   proof at trial, the party moving for summary judgment need only point out "that there is an

7   absence of evidence to support the nonmoving party's case."  *Id.* at 325.  If the moving party

8   meets its initial burden, the nonmoving party must set forth "specific facts showing that there is a

9   genuine issue for trial."  *Anderson*, 477 U.S. at 250.

## III.   DISCUSSION

11      The U.S. Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984),

12  governs ineffective assistance of counsel claims.  "To prevail on a *Strickland* ineffective assistance

13  of counsel claim, a defendant must establish that counsel's performance was deficient and that he

14  was prejudiced."  *Bemore v. Chappell*, 788 F.3d 1151, 1162 (9th Cir. 2015).

15      With respect to deficient performance, counsel's representation is deficient if it falls

16  "below an objective standard of reasonableness," as measured by prevailing professional norms.

17  *Strickland,* 466 U.S. at 687–88.  Given the "temptation for a defendant to second-guess counsel's

18  assistance after [a] conviction or adverse sentence," the U.S. Supreme Court has stated that

19  "counsel should be strongly presumed to have rendered adequate assistance and [to have] made all

20  significant decisions in the exercise of reasonable professional judgment."  *Cullen*, 563 U.S. at

21  189 (internal quotation marks and alterations omitted).  "To overcome that presumption, a

22  defendant must show that counsel failed to act reasonably considering all the circumstances."  *Id.*

23  (internal quotation marks and alteration omitted).

24      With respect to prejudice, Petitioner must show that "there is a reasonable probability that,

25  but for counsel's unprofessional errors, the result of the proceeding would have been different."

26  *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine

27  confidence in the outcome."  *Id.*  "Th[is standard] requires a substantial, not just conceivable,

28

Case No. 00-CV-01228-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS 26 AND 27

1    likelihood of a different result." *Cullen*, 563 U.S. at 189 (internal quotation marks omitted).

2          With the foregoing framework in mind, the Court turns to the specific arguments presented

3    in claims 26 and 27.

4    **A. Claim 26**

5          In claim 26 of Petitioner's amended habeas petition, Petitioner asserts that his trial counsel

6    was ineffective for "failing to investigate and present mental defenses" at the guilt and penalty

7    phases of Petitioner's trial.  Pet. at 296.  Petitioner does not distinguish between what mental

8    defense evidence should have been presented at the guilt phase trial and what mental defense

9    evidence should have presented at the penalty phase trial.  Instead, Petitioner argues that his trial

10   counsel should have investigated Petitioner's background in greater detail, which would have

11   prompted a more thorough mental health investigation, which would have resulted in additional

12   evidence being presented at the guilt and penalty phases of Petitioner's trial.

13         Given the complex and overlapping nature of Petitioner's arguments, the Court analyzes

14   Petitioner's claim as follows.  First, the Court provides background on what mental health

15   evidence was presented at the guilt phase of Petitioner's trial, what mitigation evidence was

16   presented at the penalty phase of Petitioner's trial, and what additional evidence has been

17   uncovered since trial.  Next, the Court discusses the California Supreme Court's decision on

18   Petitioner's claim in state habeas proceedings, and the appropriate level of deference that the

19   Court must accord this decision.  Finally, the Court addresses Petitioner's arguments by

20   conducting a separate guilt and penalty phase analysis.

21   **1. Background**

22         During the guilt phase of Petitioner's trial, Petitioner's trial counsel made no claims

23   regarding Petitioner's innocence.  Instead, trial counsel impeached various prosecution witnesses.

24   In addition, trial counsel relied upon the testimony of Dr. Fred Rosenthal ("Rosenthal"), a

25   psychiatrist, to establish that Petitioner suffered from "psychoactive substance abuse disorder."

26   *Id.* at 183.  Rosenthal testified that Petitioner was likely addicted to cocaine.  As a result of

27   Petitioner's addiction, Rosenthal opined that Petitioner "likely did not appreciate the seriousness

28
Case No. 00-CV-01228-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS 26 AND 27

1   and finality of killing someone for money." *Id.* at 186.  Petitioner's trial counsel went on to refer

2   to Rosenthal's testimony several times throughout trial.  In particular, at closing argument, trial

3   counsel emphasized the difference between first and second degree murder, and stated that

4   "[Petitioner's] drug usage was such that he could not . . . [at the time of the murder] arrive at and

5   determine as a result of careful thought . . . the pros and cons of doing that act."  *Id.*

6          During the penalty phase of Petitioner's trial, Petitioner's trial counsel called to the stand

7   fifteen witnesses over three trial days.  These witnesses introduced mitigating evidence regarding

8   Petitioner's upbringing, character, employment, family, drug use, religious involvement, and

9   musical skills.  These witnesses included multiple members of Petitioner's family, such as

10  Petitioner's cousin, Reginald Moore; Petitioner's mother, Narcissi Ervin; and Petitioner's sister,

11  Greta Ervin.

12         In the aftermath of Petitioner's trial, Petitioner contends that his trial counsel should have

13  conducted a more thorough investigation into Petitioner's mental health.  According to Petitioner,

14  such an investigation "would have established that Petitioner suffers from an underlying organic

15  brain impairment," a condition which, had the jury known about, "would have materially affected

16  both the guilt and penalty phases" of Petitioner's trial.  *Id.* at 297.

17         In support of this contention, Petitioner relies upon a report prepared by Dr. Joan

18  Cartwright ("Cartwright") in 2002.  The report was prepared 16 years after Petitioner murdered

19  Carlene, and 12 years after the end of the guilt and penalty phases of Petitioner's trial.  In this

20  report, Cartwright states that "multiple incidents of head trauma and exposure to toxic chemicals

21  in childhood" *may* have resulted in Petitioner "experiencing significant psychological distress and

22  disturbance along with an underlying organic brain dysfunctional condition."  ECF No. 278-6

23  ("Cartwright Rep.") at 16.  Specifically, "[t]he data suggest" that Petitioner's problems include:

24  "(1) problems accurately perceiving reality (reality testing problems); (2) difficulty controlling his

25  emotions once emotionally involved; (3) difficulty handling complex situations which require

26  'clear thinking,' especially under stress; (4) extreme difficulty coping effectively under stress; (5)

27  having a very low tolerance level for frustration; (6) having a profoundly low sense of self-esteem;

28

Case No. 00-CV-01228-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS 26 AND 27

United States District Court
Northern District of California

and (7) being very depressed." *Id.*

To buttress Cartwright's conclusions, Petitioner included in both his state habeas petition and his amended federal habeas petition six declarations from friends and family which show that Petitioner was exposed to head trauma and toxic chemicals in childhood. *See, e.g.*, Opp'n at 113. Petitioner also included a declaration from Rosenthal which states that, had Rosenthal known about Petitioner's trauma and exposure to toxic chemicals, Rosenthal would have been more "aware of the severity of [Petitioner's] mental illness." Pet. at 303.

### 2. State Habeas Proceedings and Standard of Review

Petitioner raised his arguments regarding his counsel's failure to investigate at the guilt and penalty phase trials in his state habeas petition. *See* State Pet. at 46 ("Defense counsel failed to conduct a minimally competent investigation into Petitioner's mental illness."). The California Supreme Court denied Petitioner relief without an opinion. ECF No. 278-11 at 2 ("The petition for writ of habeas corpus . . . is denied. All claims are denied on the merits."). Under U.S. Supreme Court precedent, this decision constitutes a merits adjudication subject to AEDPA deference. *Richter*, 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

In evaluating ineffective assistance of counsel claims brought under AEDPA, a federal court "must ask whether the state court was unreasonable in its application of *Strickland*, a question different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Bemore*, 788 F.3d at 1162. "The question is whether there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* (emphasis added). "AEDPA review must [therefore] be doubly deferential" for ineffective assistance of counsel claims, in order "to afford both the state court and the defense attorney the benefit of the doubt." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (internal quotation marks omitted).

### 3. Guilt Phase

#### a. Deficient Performance

11

United States District Court
Northern District of California

1    Petitioner fails to satisfy this doubly-deferential standard as it pertains to evidence that

2  should have been presented at the guilt phase of Petitioner's trial.  As an initial point, Petitioner

3  must, under AEDPA, show that the California Supreme Court's decision to deny relief was

4  contrary to or an unreasonable application of clearly established federal law as determined by the

5  U.S. Supreme Court.  However, as the Ninth Circuit recently observed, "[t]here is no clear [U.S.]

6  Supreme Court case law always requiring a mental health investigation at the guilt or penalty

7  phase."  *Gonzalez v. Wong*, 667 F.3d 965, 991 (9th Cir. 2011).

8    Nonetheless, a number of circuit courts, including the Ninth Circuit, have held that "[t]rial

9  counsel has a duty to investigate a defendant's mental state if there is evidence to suggest that the

10  defendant is impaired."  *Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003).  Petitioner's

11  trial counsel sufficiently fulfilled this duty in the instant case.

12    Petitioner's trial counsel conducted an investigation into Petitioner's mental health by

13  asking Rosenthal to evaluate Petitioner and by calling Rosenthal to the stand at the guilt phase of

14  Petitioner's trial.  While on the stand, Rosenthal stated that Petitioner "may not have the ability to

15  appreciate the real meaning of what [the murder] was all about, what he was intending or what

16  was being intended."  Pet. at 300.  In closing arguments during the guilt phase trial, Petitioner's

17  trial counsel "stressed that Dr. Rosenthal's testimony established that [Petitioner] did not

18  premeditate or deliberate the homicide due to his drug usage, and thus [Petitioner] was not guilty

19  of first degree murder."  ECF No. 278-5 (Exh. 3) at 3.

20    There was no indication, based on the information available to Petitioner's trial counsel,

21  that any further investigation into Petitioner's mental health was necessary.  In his amended

22  federal habeas petition, Petitioner makes much of the fact that, had trial counsel investigated

23  Petitioner's background, Petitioner's exposure to toxic chemicals and head trauma—and the

24  organic brain dysfunction that resulted—would have come to light.  Petitioner, for instance, cites

25  extensively to a 2002 declaration provided by Greta Ervin ("Greta"), Petitioner's sister, which

26  discusses Petitioner's childhood head trauma and exposure to toxic chemicals.  This declaration

27  was provided 16 years after Carlene's murder, and 12 years after the conclusion of Petitioner's

28

Case No. 00-CV-01228-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS 26 AND 27

United States District Court
Northern District of California

1  guilt and penalty phase trials.

2       The problem with this argument is that Petitioner's trial counsel *did* interview Greta at

3  some point while preparing for Petitioner's trial, as well as numerous other members of

4  Petitioner's friends and family.  Many of these friends and family members were in fact later

5  called to testify during the penalty phase of Petitioner's trial.

6       There is nothing in the record that suggests that any of these witnesses even mentioned

7  Petitioner's head trauma or exposure to toxic chemicals.  Nor did these witnesses discuss

8  Petitioner's alleged mental problems, other than to briefly note that Petitioner was depressed at the

9  time of Carlene's murder because Petitioner's former girlfriend had just committed suicide.  There

10 is no explanation as to why Greta or any other member of Petitioner's family did not discuss

11 Petitioner's head trauma, exposure to toxic chemicals, or mental problems with Petitioner's trial

12 counsel.  As Petitioner acknowledges, the first time that these problems came to light was when

13 Petitioner prepared his state habeas petition in 2002, twelve years after Petitioner's guilt and

14 penalty phase trials.  Pet. at 301.  Carlene was murdered in 1986, and Petitioner was convicted of

15 Carlene's murder in 1990.  Petitioner simply can not allege that his trial counsel failed to

16 investigate when trial counsel interviewed numerous members of Petitioner's family and *no*

17 family member referred to Petitioner's head trauma, exposure to toxic chemicals, or Petitioner's

18 mental problems.  *See, e.g.*, *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) ("A decision not

19 to pursue testimony by a psychiatric expert, when no mental state defense seems likely, is not

20 unreasonable under *Strickland.*").

21      Hence, because Petitioner's trial counsel called a psychiatrist to the stand to present a

22 mental defense and because trial counsel performed an adequate investigation under the

23 circumstances, trial counsel did not perform deficiently at the guilt phase of Petitioner's trial.

24                    **b. Prejudice**

25      Petitioner also can not establish prejudice at the guilt phase trial.  "To establish a legal

26 defense to first degree murder," a defendant must "prove that he lacked the ability to premeditate

27 and deliberate."  *Douglas*, 316 F.3d at 1087.  Nothing in the new evidence upon which Petitioner

28
                                        13

United States District Court
Northern District of California

1    relies—Cartwright's report and the various supporting declarations—shows that Petitioner lacked

2    the ability to premeditate and deliberate.

3          First, Cartwright's report does not even conclusively demonstrate that Petitioner suffered

4    from organic brain dysfunction at the time of Carlene's murder.  Cartwright's report was

5    completed in 2002, more than sixteen years after the murder.  The report states that Petitioner's

6    intellectual functioning, based on IQ tests, was "in the [a]verage range."  Cartwright Rep. at 11.

7    On several memory tests, Petitioner in fact tested well above average—he scored in the 99th

8    percentile on Visual Memory, the 84th percentile on General Memory, and the 83rd percentile on

9    Attention/Concentration.  *Id.* at 12.  Other test results suggested that Petitioner was only mildly

10   impaired or even within the normal range.  No test clearly indicated that Petitioner suffered from

11   significant or severe organic brain dysfunction.  *Id.* at 13.

12         Moreover, even if Petitioner did suffer from organic brain dysfunction, Petitioner's

13   condition would not have affected the disposition of this case.  Cartwright's report, for example,

14   concludes that at the time of Carlene's murder, Petitioner had difficulty "controlling his emotions"

15   and was "very depressed."  *Id.* at 16.  As recounted above, the facts of Carlene's murder do not

16   suggest that Petitioner acted impulsively or that Petitioner acted because he was depressed.

17   Instead, Petitioner negotiated a specific price to kill Carlene.  990 P.2d at 513.  Petitioner later

18   drove with his co-defendant, Robinson, to search for Carlene's car in a parking lot.  *Id.*  On the

19   way to Carlene's apartment on the night of the murder, Petitioner asked for and received a knife

20   from Robinson.  *Id.*  After Carlene's murder, Petitioner presented Carlene's driver's license as

21   proof of the killing, received $2,500, and used this money to purchase cocaine.  Petitioner also

22   stole Carlene's ring and watch.  *Id.*  Petitioner kept Carlene's car to strip, clean, or burn after

23   Carlene's murder.  Several weeks after Carlene's murder, Petitioner asked for and received an

24   additional $1,700 for the murder.

25         There was, in other words, extensive evidence that Petitioner's actions were premeditated

26   and reflected significant forethought.  As Respondent notes, Carlene's murder "was not an

27   impulsive act that resulted from frustration or from an inability to understand what [P]etitioner

28
                                            14

United States District Court
Northern District of California

1   was doing." Mot. at 89.  Petitioner has not explained how his alleged organic brain dysfunction,

2   which apparently made it difficult for him to control his emotions and resulted in him being

3   depressed, had any relationship to Carlene's murder.

4        To summarize, the additional evidence that Petitioner cites does not establish that

5   Petitioner suffered from organic brain dysfunction at the time of Carlene's murder.  Even

6   assuming that it did, Petitioner has not demonstrated prejudice by showing that "there is a

7   reasonable probability that . . . the result of the proceeding would have been different."

8   *Strickland*, 466 U.S. at 694.

9        **4. Penalty Phase**

10            **a. Deficient Performance**

11        Turning to the penalty phase of Petitioner's trial, Petitioner argues that his trial counsel

12   could have presented mitigating evidence as to Petitioner's "background and social history," such

13   as his head trauma, exposure to toxic chemicals, and mental problems.  Pet. at 316.  Trial

14   counsel's failure to investigate and to present such evidence, Petitioner contends, constitutes

15   deficient performance.

16        The Court disagrees.  The facts in this case resemble those in *Cullen v. Pinholster*.  In

17   *Pinholster*, petitioner was also convicted in California of first degree murder and sentenced to

18   death.  During the penalty phase of petitioner's trial, petitioner's counsel in *Pinholster* called a

19   single witness—petitioner's mother.  563 U.S. at 177.  Petitioner's attorneys "did not call a

20   psychiatrist, though they had consulted" with one: Dr. John Stalberg.  *Id.*  "Dr. Stalberg [took]

21   note[] [of] [petitioner's] psychopathic personality traits, diagnosed him with antisocial personality

22   disorder, [but] concluded that [petitioner] was not under the influence of extreme mental or

23   emotional disturbance at the time of" the crime.  *Id.* (internal quotation marks omitted).

24        In his state habeas petition, petitioner in *Pinholster* alleged that his trial attorneys "had

25   failed to adequately investigate and present mitigating evidence, including evidence of mental

26   disorders."  *Id.*  Petitioner supported his claim with "school, medical, and legal records, as well as

27   declarations from family members" and an evaluation from a different psychiatrist which

28

Case No. 00-CV-01228-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS 26 AND 27

1    suggested that Dr. Stalberg had not properly diagnosed the severity of petitioner's mental illness.

2    *Id.* As in the instant case, the California Supreme Court denied habeas relief.

3        Petitioner in *Pinholster* subsequently filed a federal habeas petition. The federal district

4    court held an evidentiary hearing, during which petitioner presented additional evidence of his

5    mental illness. *Id.* at 179. Considering this evidence and the declarations submitted in state

6    habeas proceedings, the federal district court granted habeas relief. The Ninth Circuit affirmed.

7        The U.S. Supreme Court reversed. First, the U.S. Supreme Court determined that the

8    district court should not have held an evidentiary hearing. As the *Pinholster* Court stated, if a

9    claim is decided on the merits by a state court, a federal district court may not hold an evidentiary

10   hearing. *Id.* at 185; *accord Sully*, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once

11   the district court has determined that § 2254(d) precludes habeas relief.")

12       As to the merits of petitioner's ineffective assistance of counsel claim, the *Pinholster* Court

13   held that petitioner "ha[d] not shown that the California Supreme Court's decision . . . involved an

14   unreasonable application of federal law." 563 U.S. at 190. Instead, counsel's decisions during the

15   penalty phase of petitioner's trial "might [have] be[en] considered sound trial strategy." *Id.* at 191

16   (quoting *Strickland*, 466 U.S. at 689). Trial counsel might, for instance, have refrained from

17   exploring petitioner's mental impairments because counsel believed that "evoking sympathy"

18   from petitioner's mother was a better penalty phase strategy. *Id.* at 193; *see id.* at 197 ("There

19   comes a point where a defense attorney will reasonably decide that another strategy is in order,

20   thus making particular investigations unnecessary.") (internal quotation marks and alteration

21   omitted). Notably, "[t]he new evidence relating to [petitioner and petitioner's] family—their more

22   serious substance abuse, mental illness, and criminal problems—[was] . . . by no means clearly

23   mitigating, as the jury might have concluded that [petitioner] was simply beyond rehabilitation."

24   *Id.* at 201 (citation omitted).

25       *Pinholster* provides guidance to the instant case. Like *Pinholster*, trial counsel here chose

26   not to recall Rosenthal as a witness at the penalty phase trial and focused instead on painting a

27   more sympathetic portrait of Petitioner. To this end, Petitioner's trial counsel called fifteen

28
16

United States District Court
Northern District of California

mitigating witnesses at the penalty phase trial to portray Petitioner in a positive light.  Petitioner's cousin, Reginald Moore, for instance, stated that Petitioner was an "easygoing" person who experienced a religious awakening in prison.  Rep. Tr. at 12093–97.  Petitioner's mother, Narcissi Ervin, testified that Petitioner was a "nice person," that Petitioner was involved in music and sports, and that Petitioner had just "got ahold to the wrong thing."  *Id.* at 12256–57.  Petitioner's sister, Greta Ervin, testified that she had a close relationship with Petitioner, that Petitioner was musically talented, and that Petitioner was depressed at the time of Carlene's murder because Petitioner's former girlfriend, Kathy Sanders, had recently committed suicide.  *Id.* at 12260–67.

In hindsight, Petitioner's trial counsel appears to have made a tactical decision to focus on Petitioner's positive characteristics at the penalty phase trial, rather than Petitioner's mental health. It is possible that Petitioner's trial counsel believed that the jury was unpersuaded by the mental health evidence that was presented at the guilt phase trial.  Re-iterating such evidence at the penalty phase trial might have been fruitless and might well have distracted from the sympathetic portrait of Petitioner that trial counsel was trying to paint.  This belief is at least partially borne out by a juror declaration provided after Petitioner's trial, which described Rosenthal as being "wishy-washy" and ineffective.  Pet. at 324.

Furthermore, as discussed above, *none* of the fifteen witnesses that Petitioner's trial counsel called to the stand during the penalty phase trial—such as Petitioner's mother, cousins, and sisters—even mentioned Petitioner's childhood exposure to toxic chemicals or head trauma. Trial counsel was therefore not on notice that such childhood evidence would have been available. Indeed, as the U.S. Supreme Court observed in *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam), a case where the U.S. Supreme Court also denied habeas relief on a similar penalty phase argument, "[t]his is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained."  *Id.* at 11 (citations omitted).  "It is instead a case, like *Strickland* itself, in which defense counsel's decision not to seek more mitigating evidence from the defendant's background than was already in hand fell well within the

17

1    range of professionally reasonable judgment[].” *Id.* at 11–12 (internal quotation marks omitted).

2    Accordingly, consistent with *Pinholster* and *Van Hook*, the Court finds that Petitioner's trial

3    counsel did not perform deficiently at the penalty phase trial.

**b. Prejudice**

5    Furthermore, even if Petitioner's trial counsel's performance was deficient, Petitioner has

6    not demonstrated prejudice at the penalty phase trial.  The new evidence upon which Petitioner

7    relies shows, at best, that Petitioner's mental problems were somewhat more pronounced than

8    what was presented at trial.  This new evidence does not, however, establish that Petitioner

9    suffered from organic brain dysfunction, and, in any event, does not explain how such dysfunction

10   would have affected Petitioner at the time of the murder.

11   Additionally, it is possible that the jury would not have found this evidence credible.  For

12   instance, Cartwright's report discusses at length the emotional distress that Petitioner was under at

13   the time of the murder, which was caused by the recent suicide of Petitioner's former girlfriend,

14   Kathy Sanders (“Sanders”).  Pet. at 321.  The jury might have discounted Cartwright's report,

15   since—at the time of the murder—Petitioner had begun dating a new girlfriend, Sharon Williams

16   (“Williams”).  Moreover, upon hearing that Petitioner stole Carlene's watch and ring to give to

17   Williams, the jury might have completely discredited the narrative that Petitioner was emotionally

18   distressed due to Sanders' suicide.

19   Additional evidence about Petitioner's possible organic brain dysfunction would have also

20   been rebutted at the penalty phase trial by an extensive list of aggravating circumstances:

21   Petitioner's negotiation of the price of Carlene's murder; Petitioner's detailed planning and

22   preparation for the murder; Petitioner's attitude before and after the murder; Petitioner's decision

23   to keep Carlene's vehicle in order to strip, clean, and burn it; and Petitioner's prior criminal

24   history.  With these aggravating factors in mind, the jury might well have concluded that

25   Petitioner was beyond rehabilitation.  Petitioner has thus not demonstrated that additional evidence

26   about Petitioner's mental problems would have caused “a substantial, [and] not just conceivable,

27   likelihood of a different result” at the penalty phase of Petitioner's trial.  563 U.S. at 189 (internal

28

Case No. 00-CV-01228-LHK

ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS 26 AND 27

United States District Court
Northern District of California

quotation marks omitted).

In sum, the California Supreme Court's decision to deny habeas relief on Petitioner's ineffective assistance claim for failure to investigate and present a more complete mental defense at the guilt and penalty phase trials was not contrary to or an unreasonable application of clearly established federal law.  Respondent's motion for summary judgment on claim 26 is GRANTED.

**B.  Claim 27**

In Claim 27 of Petitioner's amended habeas petition, Petitioner argues that his trial counsel was ineffective because trial counsel failed to prepare a defense about Petitioner's "organic brain damage," that one of his trial attorneys was "napping," and that his other trial attorney could not "function at a minimally effective level" because of "devastating injuries suffered in [an] aircraft crash."  Pet. at 326.  The Court has already rejected Petitioner's claim regarding trial counsel's failure to present a mental defense.  The Court addresses Petitioner's remaining arguments—his attorney's napping and his other attorney's physical injuries—below.

**1.  Napping of Trial Counsel (Broome)**

Petitioner was represented by two attorneys at trial: Thomas Broome ("Broome") and Gail Bereola ("Bereola").  According to declarations provided by four jurors, Broome appeared to nap at various times during trial.  Juror Robert Corneal stated that "Broome[] dozed off occasionally." Pet. at 323.  Juror Harvey Hendrix stated that Broome "was given to lapses in focus and concentration.  At times he dozed off."  *Id.*  Juror Judith Anderson-Locklear stated that "Broome fell asleep too much."  *Id.* at 325.  A fourth juror noted that Broome "appeared to be sleeping during portions of trial."  *Id.*  Rudolph Wilson, an alternate juror, also provided a declaration but did not state that Broome was asleep.  *Id.* at 324.

Petitioner argues that Broome's sleeping constituted ineffective assistance of counsel. Petitioner presented this claim in his state habeas petition, *see* State Pet. at 83, which the California Supreme Court denied.

Petitioner's request for habeas relief from this Court is equally unavailing.  First, Petitioner must demonstrate that the California Supreme Court's decision was contrary to or an unreasonable

19

1  application of clearly established federal law.  A state court's decision is "contrary to" clearly

2  established federal law "if the state court arrives at a conclusion opposite to that reached by [the

3  U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the

4  U.S. Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. 362 at

5  412–13.  A state court's decision is an "unreasonable application" of clearly established federal

6  law if "the state court identifies the correct governing legal principle . . . but unreasonably applies

7  that principle to the facts of the . . . case." *Id.* at 413.

8       Here, Petitioner has cited no case where the U.S. Supreme Court has expressly held that

9  counsel sleeping at trial constitutes ineffective assistance.  The Court has found none in its own

10 research.  At most, the U.S. Supreme Court has stated that, "when a defendant is deprived of the

11 presence and assistance of his attorney, either throughout the prosecution or during a critical stage

12 in, at least, the prosecution of a capital offense, reversal is automatic." *Holloway v. Arkansas*, 435

13 U.S. 475, 489 (1978).

14      Courts, however, have determined that the holding in *Holloway* does not apply where a

15 party is represented by multiple attorneys, and at least one attorney provides constitutionally

16 effective assistance at all times.  As the Seventh Circuit has explained, "[t]he [U.S.] Supreme

17 Court has consistently limited the presumption of prejudice to cases where counsel is physically

18 absent at a critical stage.  Here, a counsel was physically present at all stages of the litigation—

19 Levin's co-counsel, Steven Decker represented [petitioner] in Levin's absence—and therefore, we

20 cannot conclude that [petitioner] was denied counsel at critical stages of trial." *Morgan v. Hardy*,

21 662 F.3d 790, 804 (7th Cir. 2011).

22      Similarly, in *United States v. Rosnow*, 981 F.2d 970, 971–72 (8th Cir. 1992), the Eighth

23 Circuit rejected an ineffective assistance claim where petitioners were represented by two

24 attorneys, one attorney who was duly licensed and one attorney who had his law practice

25 suspended.  As the court explained, "[w]e do not find that petitioners here were denied effective

26 assistance of counsel because throughout the appellate process they were jointly and later

27 independently represented by a duly licensed attorney. . . .  If co-counsel provides petitioners with

28

Case No. 00-CV-01228-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS 26 AND 27

1   effective assistance at all critical stages of the proceedings, petitioners' Sixth Amendment rights

2   have been protected." *Id.* at 972.[2]

3          In the instant case, Petitioner was represented by two attorneys at trial: Broome and

4   Bereola.  There have been no allegations that Bereola fell asleep during any part of Petitioner's

5   trial.  Thus, even if Broome fell asleep at times during trial, Petitioner was still represented by

6   Bereola.  Petitioner was never completely denied the assistance of counsel.  Accordingly,

7   consistent with *Morgan* and *Rosnow*, Bereola's continuous presence and representation negates a

8   finding of ineffective assistance of counsel.

9          Petitioner's claim also fails for an additional reason.  In determining "when a defendant is

10  deprived of the presence and assistance of his attorney," *Holloway*, 435 U.S. at 489, most federal

11  courts have held that, under AEDPA, trial counsel must sleep through a "substantial portion" of a

12  trial in order to be presumptively prejudicial.  *Burdine v. Johnson*, 262 F.3d 336, 349 (5th Cir.

13  2001) (en banc).  As the Fifth Circuit put it in *Burdine*, "we decline to adopt a per se rule that any

14  dozing by defense counsel during trial merits a presumption of prejudice.  Our holding [instead is]

15  that the repeated unconsciousness of . . . counsel through not insubstantial portions of . . . [a]

16  capital murder trial warrants a presumption of prejudice."  Likewise, in *Muniz v. Smith*, 647 F.3d

17  619, 625–26 (6th Cir. 2011), the Sixth Circuit determined, under AEDPA, that a petitioner "must

18  show that his attorney slept through a substantial portion of the trial for the . . . presumption of

19  prejudice to attach."

20         The Ninth Circuit has applied the "substantial portion" test in several pre-AEDPA cases.

21  *See, e.g.*, *Javor v. United States*, 724 F.2d 831, 833 (9th Cir. 1984) (establishing "substantial

22

23  _____

24  [2] State courts are in accord with the reasoning in *Morgan* and *Rosnow*.  *See, e.g.*, *Ex parte McFarland*, 163 S.W.3d 743, 753 (Tex. Crim. App. 2005) ("Appellant had two attorneys. Appellant was never without counsel. . . . Had Mr. Benn been the sole attorney, [defendant's]

25  Sixth Amendment right to counsel might well have been denied . . . .  But, Mr. Benn was not his sole attorney."); *Jackson v. State*, 290 S.W.3d 574, 578 (Ark. 2009) ("[T]he cases on which

26  [appellant] relies involve a sole defense attorney sleeping through large portions of the trial.  Here, on the other hand, [appellant] had four attorneys, all of whom participated in voir dire.  Moreover,

27  the record does not reflect how long [one attorney] had been asleep, and even during those periods when he was sleeping, [appellant's] other attorneys were actively engaged in voir dire.").

28

Case No. 00-CV-01228-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS 26 AND 27

1    portion" test); *United States v. James*, 8 F.3d 32, *3 (9th Cir. 1993) (Table) (applying "substantial

2    portion" test).  In *Murray v. Schriro*, 746 F.3d 418, 459 (9th Cir. 2014), however, the Ninth

3    Circuit noted that the "substantial portion" test had not yet been endorsed by the U.S. Supreme

4    Court, and that circuit court precedent could not constitute clearly established federal law under

5    AEDPA.  Nonetheless, the Ninth Circuit appeared to still use the "substantial portion" test as a

6    guide for its analysis in *Murray*, a case where petitioner's habeas petition was governed by

7    AEDPA.  *See, e.g.*, *id.* at 461 (describing petitioner's "*Strickland* claim [as] hing[ing] on the fact

8    that his counsel slept through substantial portions of trial").  Thus, consistent with the reasoning in

9    *Muniz* and *Burdine*, and in accord with the Ninth Circuit's analysis in *Murray*, the Court applies

10   the "substantial portion" test to the instant case.

11           Here, the evidence does not demonstrate that Broome slept through a "substantial portion"

12   of Petitioner's trial.  There were twelve jurors and five alternate jurors at Petitioner's trial.  Rep.

13   Tr. at 9095.  Of these 17 individuals, only four submitted declarations which state that Broome fell

14   asleep at trial.  Notably, none of the declarations states that Broome slept through a substantial

15   portion of the trial.  One of the declarations in fact states that Broome only "dozed off

16   occasionally."  Pet. at 323.  At least one alternate juror who submitted a declaration did not state

17   that Broome was asleep.

18           In addition, in *Murray*, the Ninth Circuit observed that, "[m]ost telling was the state's

19   demonstration from the transcripts that counsel was actively questioning witnesses and objecting

20   to testimony" during critical parts of trial.  746 F.3d at 461.  Furthermore, the *Murray* court noted

21   that, during an evidentiary hearing in state court, "[n]either the bailiff nor the investigator

22   remembered . . . trial counsel sleeping during the trial.  Neither did co-counsel [or the prosecutor]

23   recall . . . trial counsel falling asleep during trial."  *Id.* at 460.  Both of these factors—whether

24   counsel was actively questioning witnesses and objecting to testimony and whether another court

25   actor observed counsel asleep—also weigh against Petitioner.

26           First, in the instant case, one of the most highly contested issues at trial was the credibility

27   of Armond Jack, a prosecution witness.  Issues regarding Jack's credibility have been the focus of

28
                                                    22

United States District Court
Northern District of California

United States District Court
Northern District of California

1    multiple orders by this Court.  *See, e.g.*, ECF No. 282 at 7–11 (discussing impeachment testimony

2    of Jack); ECF No. 289 at 9 (same).  The trial transcript indicates that, during Jack's direct

3    examination, Broome made frequent and regular objections.  *See, e.g.*, Rep. Tr. at 9541 (hearsay

4    objection); *id.* at 9543 (hearsay objection); *id.* at 9545 (objection because answer "calls for

5    speculation").  Broome also appeared active during another highly contested phase of trial—jury

6    selection.  *See, e.g.*, *id.* at 9082 (discussing demeanor of prospective juror and requesting

7    opportunity to ask juror additional questions).  A more general review of the trial transcripts

8    indicates that Broome was engaged during cross-examination of other witnesses, participated in

9    sidebars, and worked closely with counsel for Petitioner's co-defendants.

10       Second, in Petitioner's state habeas petition, Petitioner included declarations from Broome

11   and Bereola.  Neither of these declarations states that Broome was asleep at trial.  A declaration

12   from an alternate juror did not state that Broome was sleeping.  There is no mention in the trial

13   transcript of Broome suffering from a lapse in attention.  At no point in the trial transcript did the

14   state trial judge, prosecutor, bailiff, or any witness indicate or state that Broome was sleeping.

15       The Court acknowledges that this case differs from *Murray* because, in *Murray*, the state

16   habeas court actually held an evidentiary hearing.  The prosecutor, bailiff, and co-counsel all

17   testified at this hearing, and the state habeas court was able to make a factual determination based

18   on this testimony and other evidence.  Here, no such evidentiary hearing took place.  Nonetheless,

19   the Court finds that four juror declarations, none of which state that Broome slept through a

20   substantial portion of trial, does not compel a finding in Petitioner's favor.  These declarations are

21   counterbalanced by the declarations provided by Broome, Bereola, and an alternate juror, and by

22   the trial transcript.  At the very least, the Court can not conclude that the California Supreme

23   Court's decision was contrary to or an unreasonable application of clearly established federal law.

24   Petitioner was assisted at all times by at least one attorney, and there is insufficient evidence to

25   show that Broome was asleep during substantial portions of trial.

26       **2.  Injury of Trial Counsel (Bereola)**

27       Petitioner also argues that Bereola, his other trial attorney, suffered "devastating injuries"

28

from an airplane crash in 1989. Pet. at 326. Bereola was "paralyzed from the waist down." *Id.*

"As a consequence, the defense for Petitioner was inadequately prepared, e.g., witnesses were not interviewed, evidence that could have been presented at the guilt and penalty phases were not, and [Petitioner] was not even psychologically examined." *Id.*

This argument is not well taken. First, Petitioner has cited no legal authority to support his contention that physical injuries or paralysis may form the basis of an ineffective assistance of counsel claim. The Court has found none in its own research. Second, and relatedly, Petitioner has not explained how Bereola's injuries affected her ability to represent Petitioner. Petitioner does not specify what other witnesses should have been interviewed and what other evidence should have been presented. Third, there is no support for Petitioner's suggestion that Bereola could not perform in a constitutionally competent manner because of her injuries. In fact, one year after Petitioner's trial concluded in 1991, California Governor Pete Wilson appointed Bereola as a Municipal Court Judge. In 1998, Governor Wilson appointed Bereola a Superior Court Judge, and Bereola continues to serve as a Superior Court Judge today. Given Bereola's extensive judicial service, there is no indication that her physical injuries have prevented her from pursuing a respected legal career. Petitioner's argument regarding Bereola's ineffectiveness lacks merit.

### 3. Cumulative Error

As a final point, Petitioner argues that the cumulative effect of his trial counsel's ineffectiveness at the guilt and penalty phase trials prejudiced Petitioner and requires reversal of Petitioner's conviction. Pet. at 326. Petitioner, though, has failed to establish even a single clearly established deficiency on the part of trial counsel. Hence, Petitioner fails to establish cumulative prejudice. Accordingly, Respondent's motion for summary judgment on claim 27 is GRANTED.

## IV.   CONCLUSION

For the foregoing reasons, Respondent's motion for summary judgment as to claims 26 and 27 is GRANTED. In addition, because Petitioner's arguments as to claims 26 and 27 are unavailing, Petitioner's request for an evidentiary hearing as to claims 26 and 27 is DENIED. *See Sully*, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once the district court has

Case No. 00-CV-01228-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS 26 AND 27

1  determined that § 2254(d) precludes habeas relief.").

2  **IT IS SO ORDERED.**

3  Dated:  September 7, 2016.

4  _____

5  LUCY H. KOH
   United States District Judge

Case No. 00-CV-01228-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT ON CLAIMS 26 AND 27